746 So.2d 316 (1999)
ABBOTT LABORATORIES et al.
v.
Cecil DURRETT et al.
1960464.
Supreme Court of Alabama.
June 25, 1999.
Rehearing Denied October 22, 1999.
William D. Coleman and Raymond L. Jackson of Capell, Howard, Knabe & Cobbs, P.A., Montgomery, for appellant Ciba-Geigy Corp. and on behalf of all Manufacturer defendants.
Richard H. Gill of Copeland, Franco, Screws & Gill, Montgomery, for appellant Schering-Plough Corp. and on behalf of all Manufacturer defendants.
Lawrence B. Clark and E. Burton Spence of Lange, Simpson, Robinson & Somerville, L.L.P., Birmingham, for appellants.
Joe R. Whatley, Jr., Russell Jackson Drake, and Peter Burke of Cooper, Mitch, Crawford, Kuykendall & Whatley, L.L.C., Birmingham; and Michael Straus and Philippa McC. Bainbridge of Bainbridge & Straus, Birmingham; J. Michael Rediker, Thomas L. Krebs, Steven P. Gregory, and Michael J. Skotnicki of Ritchie & Rediker, Birmingham; David Cromwell Johnson and J. Flint Liddon of Johnson, Liddon, Bear & Tuggle, Birmingham; J.L. Chestnut, Jr., of Chestnut, Sanders, Sanders & Pettaway, P.C., Selma; and T. Roe Frazer II, Richard Freese, and Dennis C. Sweet III of Langston, Frazer, Sweet & Freese, P.A., Jackson, MS, for appellees.
J. Vernon Patrick, Jr., and Jeffrey V. Havercroft of J. Vernon Patrick, Jr. & Assocs., P.C., Birmingham, for Eli Lilly & Co.
Amici curiae:
Tabor R. Novak, Jr., and E. Hamilton Wilson, Jr., of Ball, Ball, Matthews & Novak, P.A., Montgomery, for amici curiae *317 Durr Drug Company and Bergen Brunswig Corp.
Crawford S. McGivaren, Jr., of Cabiness, Johnston, Gardner, Dumas & O'Neal, Birmingham, for amici curiae Cardinal Health, Inc., Whitmire Distribution Corp., Bindley Western Industries, Inc., McKesson Corp., and Amerisource Corp.
Melvin R. Goldman and Lori A. Schechter of Morrison & Foerster, L.L.P., San Francisco, CA; Thomas L. Long of Baker & Hostetler, Columbus, OH; Nada S. Suliaman of Arent Fox Kintner Plotkin & Kahn, Washington, DC; J. Thomas Rosch and Peter K. Huston, San Francisco, CA; and Howard D. Scher and Steven E. Bizar of Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA.
Luther S. Pate IV; Herman Watson, Jr., and Samuel H. Givhan of Watson Jimmerson, P.C., Huntsville, for farming plaintiffs in another case and for "Alabama Farming Businesses"; and Jerry James Wood, Montgomery, for Home Bldrs. Ass'n of Alabama, Inc.

On Rehearing Ex Mero Motu
PER CURIAM.
The opinion of July 31, 1998, is withdrawn and the following is substituted therefor.
The issue presented on this appeal is whether Ala.Code 1975, § 6-5-60, provides a cause of action for damage alleged to have resulted from a conspiracy to control the price of brand-name prescription drugs that were shipped from companies out-of-state into Alabama. The trial court ruled that § 6-5-60 provides such a cause of action; therefore, it denied the defendants' motion for a judgment on the pleadings. We granted the defendants' request for permission to appeal that interlocutory order. Rule 5, Ala.R.App.P. We reverse and remand.
The plaintiffs, individual owners of independent drug stores in Greene and Dallas Counties, filed this action on behalf of themselves and seeking to represent a class consisting of "similarly situated independent retail pharmacists in Alabama who purchase brand-name prescription drugs from the defendant manufacturers and defendant wholesalers at illegally high prices dictated by the discriminatory pricing scheme set by the defendant manufacturers." The defendants are various drug manufacturers, drug wholesalers, health maintenance organizations, and mail-order companies. The complaint alleges that each of the manufacturer and mail-order-company defendants is a foreign corporation with its principal place of business outside Alabama and that the same is true for the majority of the wholesaler defendants. The complaint also alleges that the health-maintenance-organization defendants are Alabama corporations and that they, along with the other defendants, engaged in a conspiracy to control the price of brand-name prescription drugs shipped into Alabama. The plaintiffs allege that they were injured as a result of that conspiracy by being forced to pay the manufacturers and the wholesalers more for the drugs than was paid to those companies by the mail-order companies and the health maintenance organizations, which are alleged to have been "favored purchasers" and an integral part of the price-fixing scheme.
Citing, among other cases, Georgia Fruit Exchange v. Turnipseed, 9 Ala.App. 123, 62 So. 542 (1913); Dothan Oil Mill Co. v. Espy, 220 Ala. 605, 127 So. 178 (1930); Ex parte Rice, 259 Ala. 570, 67 So.2d 825 (1953); San Ann Tobacco Co. v. Hamm, 283 Ala. 397, 217 So.2d 803 (1968); In re Brand Name Prescription Drugs Antitrust Litigation, [No. 94 C 897, October 2, 1996] (N.D.Ill.1996), reversed, 123 F.3d 599 (7th Cir.1997); In re NASDAQ Market Makers Antitrust Litigation, 929 F.Supp. 174, 179 (S.D.N.Y.1996); and Warren v. Playmobil U.S.A., Inc., [CV-95-B-1591-S, March 19, 1996] (N.D.Ala. 1996), the defendants contend that Alabama's antitrust statutes have consistently been interpreted by state and federal courts to apply only to transactions involving intrastate commerce. The defendants argue that Alabama's antitrust statutes, including § 6-5-60, have the same field of operation today that they had when they were first enacted. According to the defendants, the legislative history of Alabama's antitrust statutes, as well as the *318 state of federal caselaw at the time of their enactment, creates a presumption that the Legislature never intended to directly regulate agreements to control the price of goods shipped in interstate commerce. This presumption, the defendants argue, has not been overcome by the plaintiffs.
The plaintiffs contend that § 6-5-60 provides a cause of action in favor of "[a]ny person, firm, or corporation injured or damaged by an unlawful trust, combine or monopoly, or its effect, direct or indirect," and against "any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly." According to the plaintiffs, § 6-5-60 is clear on its face and should not be construed so narrowly as to limit its application to transactions involving intrastate commerce. The plaintiffs maintain, in the alternative, that even if § 6-5-60 should be construed in light of the legislative history of Alabama's antitrust statutes and the state of federal caselaw at the time of their enactment, the clear intent of the Legislature in enacting § 6-5-60 was to regulate all agreements in restraint of trade, whether those agreements involved interstate commerce or intrastate commerce.
With the positions of the parties in mind, we pause to point out what this case is not about. We are not here concerned with whether the Legislature, based on the current state of federal caselaw, has the power to enact a statute, such as § 6-5-60, to provide a means of redress to Alabama companies for indirect injuries suffered as the result of agreements to control the price of goods shipped through interstate commerce. See California v. ARC America Corp., 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), cited by the parties for the proposition that the Legislature now has that power.[1] This Court has held that an Alabama statute does not expand like an accordion with changes in federal law bearing on the Legislature's power. Instead, we are concerned only with whether the Legislature, when it enacted § 6-5-60, contemplated that it would apply to such agreements. See In re Upshaw, 247 Ala. 221, 23 So.2d 861 (1945).
In determining whether § 6-5-60 provides a cause of action for damage resulting from an agreement to control the price of goods shipped through interstate commerce, we must follow the cardinal rule of statutory construction and ascertain and give effect to the intent of the Legislature in enacting the statute. If possible, legislative intent should be gathered from the language of the statute itself. John Deere Co. v. Gamble, 523 So.2d 95 (Ala.1988).
However, when circumstances surrounding the enactment of a statute cast doubt on the otherwise clear language of the statute, we must look to other factors in determining legislative intent. In Siegelman v. Chase Manhattan Bank (USA), N.A., 575 So.2d 1041 (Ala.1991), this Court was faced with the question whether the financial-institution excise tax, levied pursuant to Ala.Code 1975, § 40-16-1 et seq., applied to the credit-card business conducted by national banks located outside Alabama with Alabama residents. When that excise-tax statute was enacted in 1935, such taxation by the states was prohibited *319 by federal statutes and caselaw. Federal law changed in 1976 so as to allow the taxation of national banks; the state argued that that change should render out-of-state national banks subject to the 1935 excise-tax statute. This Court rejected that argument, stating, at 575 So.2d at 1048-51:
"In the case presently before us, the trial court in its opinion stated that Ex parte Dixie Tool & Die Co., [537 So.2d 923 (Ala.1988)], controlled the resolution of the case:
"`In Dixie Tool & Die, as in the instant case, the issue was whether in originally enacting the statute, the legislature intended to tax transactions not previously taxed under that statute.
"`The Court holds that at the times § 40-16-1 was enacted, the State was prohibited by federal statute from taxing out-of-state national banks. The National Bank Act expressly limited the state's authority to tax only those "national banking associations located within its limits." Because the federal statute was in force at the time § 40-16-1 was enacted, full knowledge and information as to the prior and existing law on the subject of this section [are] imputed to the legislature. A legislature is presumed to know the limit of its taxing power. Further, the statute will be interpreted on the assumption that the legislature was aware of existing statutes at the time new statutes are enacted.
"`Based on the foregoing, the Court finds that at the time § 40-16-1 was enacted the legislature could not have intended to impose a tax on out-of-state national banks.'
"In Dixie Tool & Die Co., the Alabama Department of Revenue assessed a sales tax against an Alabama corporation for sales made to out-of-state buyers and to federal government contractors. The Court in Dixie Tool & Die Co. considered whether sales made by the corporation to out-of-state purchasers were subject to Alabama's sales tax. The sales tax provision in question was Ala.Code 1975, § 40-23-4(a)(17). This code section provides:
"`(a) There are exempted from the provisions of this division and from the computation of the amount of the tax levied, assessed or payable under this division the following:
"`. . . .
"`(17) The gross proceeds of sales of tangible personal property or the gross receipts of any business which the state is prohibited from taxing under the Constitution or laws of the United States or under the Constitution of this state.'
"In its opinion, the Court in Dixie Tool & Die Co. recognized that the United States Supreme Court allowed taxation of interstate commerce if the tax met certain criteria. However, the Court stated:
"`"[These] recent pronouncements of the United States Supreme Court which enlarge the permissible area of state taxation cannot change the intent or enlarge the scope of enactments passed by our Legislature. State v. Southern Electric Generating Co., 274 Ala. 668, 151 So.2d 216 (1963). Therefore, the question is not whether the State may, under prevailing caselaw, impose a tax upon the gross receipts earned from those transactions. Rather, the controlling issue is whether, in originally enacting this statute, the Legislature intended to tax these transactions."
"`The provision that has become § 40-23-4(a)(17) was originally enacted in 1959. In 1959, and, indeed, until Complete Auto Transit [v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326] in 1977, the applicable case law held that a tax on the sale of goods in interstate commerce was invalid. The Legislature must be deemed to have *320 been aware of the then-existing limits on a state's power to tax when it enacted the 1959 statute from which § 40-23-4(a)(17) derives. Thus, we must presume that the legislature knew, at the time the statute was passed, that the applicable case law would prevent the application of a sales tax to transactions in interstate commerce. The Legislature must also be presumed to be aware of the judicial enlargement of the State's permissible area and method of taxation, so it could have taken full advantage of those changes if it either intended or desired to do so. No changes have been made to § 40-23-4(a)(17). We conclude, therefore, that it applies today in the same manner that it did when enacted in 1959 and that it exempts sales of goods in interstate commerce from sales tax.'
"537 So.2d at 925 (quoting Ex parte Louisville & Nashville R.R., 398 So.2d 291, 293 (Ala.1981) (emphasis in [Louisville & Nashville])).
"The trial court also relied on Ex parte Louisville & Nashville R.R., supra. In Ex parte Louisville & Nashville R.R., the Court considered `whether Alabama's gross receipts tax upon a railroad's earnings from "intrastate business" applies to receipts generated by the L & N Railroad's movement of goods between two points in Alabama.' Id. at 292. The railroad gross receipts tax statute in question, Ala.Code 1975, § 40-21-57, provided:
"`In addition to all other taxes imposed by this title, there is hereby levied a license or privilege tax upon each person engaged in the business of operating a railroad in the state of Alabama for the privilege of engaging in such business; said license tax or privilege tax shall be ... in a sum equal to two and one-half percent of the gross receipts in excess of $150,000.00 of such railroad from all intrastate business of such railroad within the state of Alabama during the preceding year, the gross intrastate earning to be determined by the amount received from intrastate business.'
"The Court stated that the controlling issue in the case was whether in originally enacting the statute the legislature intended to tax these transactions:
"`The question before us is one of legislative intent. We presume that, in enacting the statute in 1935, the Legislature was aware of the existing interpretations and permissible limits of a state's power to tax. Thus, we presume our Legislature knew that at the time the statute was passed, the rule in [Minnesota v.] Blasius, [290 U.S. 1, 54 S.Ct. 34, 78 L.Ed. 131 (1933),] would have prevented the application of the tax to transactions similar to those at issue because they constitute a portion of interstate commerce. We also presume that the Legislature was aware of the fact that this tax could not be sustained as one "in lieu of other taxes because the tax was expressly levied "[i]n addition to all other taxes." Similarly, we presume that the Legislature was apprised of the fact that it could not justify this tax as one upon "local activity," because to do so would require the indulgence in the proscribed conceptual segmentation of the integral parts of an interstate transaction. Finally, we presume that the Legislature is aware of the judicial enlargement of the State's permissible area and method of taxation, so that the Legislature could have taken full advantage of those changes if it either intended or desired to. No such changes have been made during the forty-five years since the statute was passed and the State has not, by legislation, attempted to enlarge the scope of its taxation. Thus, viewed in its broadest scope, the statute in question could reach and impose a tax upon only those activities which were local and purely intrastate in character. *321 We therefore conclude that the statute, as enacted in 1935 and as it exists today, was not intended to apply to receipts generated by transactions such as these which, although conducted wholly within the confines of Alabama, constitute an integral portion or segment of interstate commerce.'
"398 So.2d at 296-97. See also State v. Southern Elec. Generating Co., 274 Ala. 668, 151 So.2d 216 (1963).
"Like the question in Dixie Tool & Die Co. and Ex parte Louisville & Nashville R.R., the question before us is whether in originally enacting the Alabama Excise Tax Statute, the legislature intended to tax the net income derived by out-of-state national banks from solicitation of credit card applications from Alabama residents.
"In determining the intent of the legislature, we presume that in enacting the Excise Tax Statute the legislature was aware of existing prohibitions against the State's power to tax national banks. When the Excise Tax Statute was enacted in 1935, federal law and judicial interpretation prohibited states from taxing out-of-state national banks. It was not until the Congressional moratorium expired in 1976 that states were allowed to tax out-of-state national banks. Even after the expiration of the moratorium in 1976, the Alabama legislature failed to amend or to reenact the Excise Tax Statute in light of the federal change. See Freeman v. Jefferson County, 334 So.2d 902, 904 (Ala.1976) (`the rejection of an [a]mendment by the Congress which would have made the statute applicable to a given situation furnishes a strong inference that the statute was not intended to be applicable to that given situation'). Also, the Alabama legislature failed to amend or to reenact the Excise Tax Statute after the United States Supreme Court's 1977 announcement that there would no longer be a per se ban on taxation of interstate commerce. In fact, the last amendment to the Excise Tax Statute occurred in 1978, after the change in both federal statutory and judicial law that would have allowed taxation of out-of-state national banks, and no provision was then made for such taxation. Ala. Acts 1978, Special and Regular Sessions, Act No. 840, p. 1247. We do note, however, that a bill was introduced in the 1990 Regular Session of the Alabama legislature for the stated purpose of extending the Excise Tax Statute to out-of-state national banks, but it was not enacted. House Bill No. 944, Legislative Digest, Final Status p. 14 (May 3, 1990).
"In the present case, we recognize that under existing federal law and judicial enlargement states are able to tax out-of-state national banks if their taxing measures are nondiscriminatory. See 12 U.S.C. § 548 (1988). However, when the Excise Tax Statute was enacted in 1935, federal law prevented taxation of out-of-state national banks. In addition to the changes implemented by Congress in 1976, the United States Supreme Court changed its position so as to allow taxation of interstate commerce. See Complete Auto Transit, Inc. v. Brady, supra.
"Under prevailing Alabama statutory construction law, we presume that the legislature was aware of the federal law in 1935 and of the subsequent changes in that law in 1976, as well as the changes in the United States Supreme Court's analysis of the taxation of interstate commerce. Ex parte Louisville & Nashville R.R., supra, and Ex parte Dixie Tool & Die Co., supra. Although the Alabama legislature presumably was aware of Congress's enlargement of state taxing power over national banks, and of the United States Supreme Court's enlargement in regard to taxation of interstate commerce, it made no changes to the Excise Tax Statute.
"This Court's role is not to displace the legislature by amending statutes to *322 make them express what we think the legislature should have done. Nor is it this Court's role to assume the legislative prerogative to correct defective legislation or amend statutes. Consequently, we conclude that the Excise Tax Statute applies today in the same manner that it did when it was first enacted. Because states were prohibited from taxing out-of-state national banks at the time the statute levying the excise tax was first enacted and judicial interpretation disallowed taxation of interstate commerce, the State may not tax Chase, an out-of-state national bank, in the absence of additional action by the Alabama legislature."
This Court, in Ellis v. Pope, 709 So.2d 1161 (Ala.1997), reaffirmed Siegelman, Ex parte Dixie Tool & Die, and Ex parte Louisville & N.R.R., insofar as those cases require that we look to the original intent of the Legislature when interpreting a statute. In Pope, this Court adopted, as part of its opinion, a portion of the trial court's order, including this statement:
"The meaning of the term `district' appears to have varied over the years. Since the [1973] adoption of the present Judicial Article [of the Alabama Constitution], `district' [as in references to the district court] has come to mean a judicial subdivision of the State geographically equal to or less than a `circuit.' It usually coincides with county boundaries, and is never a subdivision of a county. The term must not be viewed in light of its meaning today, but as it was used in 1901, when Art. I, § 6, was drafted. Act No. 569, Acts of Alabama, 1907, which subdivided Coffee County, was adopted within six years of the ratification of our present Constitution, and that Act used the term `district' to refer to the subdivisions of the county. Therefore, it must be concluded that the term `district' in the terminology used at the time of the drafting and ratification of [the Alabama] Constitution in 1901 meant the subdivision of a county."
709 So.2d at 1165.
Section 6-5-60 provides:
"(a) Any person, firm, or corporation injured or damaged by an unlawful trust, combine or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of $500 and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly and may commence the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly. All such actions may be prosecuted to final judgment against any one or more of the defendants thereto, notwithstanding there may be a dismissal, acquittal, verdict, or judgment in favor of one or more of the defendants.
"(b) Actions under this section may be commenced in any county where the trust, combine, or monopoly was formed or where it exists or is carried on, promoted, operated, practiced, employed, used, or enjoyed, or in any county in which either of the defendants may have a domicile or where an officer or agent of any defendant corporation may be found."
As the plaintiffs correctly point out, § 6-5-60 is not, on its face, limited to transactions involving intrastate commerce. We hasten to add, however, that there is no language in § 6-5-60 that conclusively indicates an intent on the Legislature's part to regulate transactions involving the shipment of goods through interstate commerce. Because the language of § 6-5-60, standing alone, is not conclusive on the question of legislative intent, and because other factors, including the legislative history of Alabama's antitrust statutes, as well as the state of the law at the time of their enactment, cast doubt on the original intent of the Legislature, we find it necessary *323 to look beyond the language of the statute.
"From this country's beginning there has been an abiding and widespread fear of the evils which flow from monopoly that is, the concentration of economic power in the hands of a few. By 1890, there was a vast accumulation of wealth in the hands of corporations and individuals, and an enormous development of corporate organization with the facility for combining into `trusts.' Units of traders and producers had snowballed by combining into trusts, and there was a widespread impression that the trusts had used and would use their power to oppress individuals and injure the public. Competition was threatened; price control was feared; and individual initiative was dampened.
"On the basis of these fears, Congress passed the Sherman Antitrust Act in July 1890 [15 U.S.C. § 1 et seq.], in order to prevent or suppress devices or practices which create monopolies or restrain trade or commerce by suppressing or restricting competition and obstructing the course of trade. It is designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. The basic objective of the Act, therefore, is the protection of competition and a competitive process that brings to consumers the benefits of lower prices, better products, and more efficient production methods. Thus, the purpose of the Act is not to protect businesses from the working of the market, but to protect the public from the failure of the market. The Act is not directed against conduct which is competitive, even severely so, but is directed against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns, but out of concern for the public interest."
54 Am.Jur.2d Monopolies, Restraints of Trade, and Unfair Trade Practices § 1 (1996).
Following the lead of other states, the Alabama Legislature enacted this state's first general antitrust law on February 7, 1891.[2] Ala. Acts 1890-91, Act No. 202, p. *324 438, entitled "An Act [t]o prohibit pools, trusts, or combines to regulate or control the prices of products, goods, wares or merchandise in this state," was patterned after a similar statute that had been enacted in Illinois and was akin to the Sherman Antitrust Act, which Congress had enacted shortly before on July 2, 1890. Act No. 202, which was criminal in nature, provided:
"Section 1. Be it enacted by the General Assembly of Alabama, That any person, corporation or association of persons who shall, within this state, engage or agree with other persons, corporations or association of persons, or enter into, either directly [sic], any combination, pool, trust or confederation to regulate or fix the price of any article or commodity to be sold within this state for speculation; and any person, corporation or association of persons who shall enter into, become a member of a party to, any pool, agreement, combination or confederation to fix or limit the amount or quantity of any article or commodity to be produced or manufactured, mined or sold in this state, shall be guilty of a misdemeanor, and subject to indictment and punishment as herein provided.
"Sec. 2. Be it further enacted, That it shall not be lawful for any corporation chartered under the laws of Alabama, or for any officer, stockholder, agent or employe of such corporation to enter into any combination with other persons or corporations, the purpose and effect of which are to place the management or control thereof in the hands of others, with the purpose or intent to limit or fix the price, or lessen the production or sale of any article of commerce, use or consumption, or to restrict or diminish the manufacture of such article.
"Sec. 3. Be it further enacted, That any person or corporation violating the provisions of section one or two of this act, within the State of Alabama, shall, on conviction, be fined not less than five hundred dollars, nor more than two thousand dollars, at the discretion of the jury trying the same; and any officer, agent or employe of such corporation guilty of violating either of the two preceding sections of this act may be imprisoned, in addition to the fine, not less than six months, and not more than twelve months for every such offense: Provided, That nothing in this act shall prevent the producers of agricultural products from holding the same for higher prices; And provided further, That nothing in this act shall prevent the producer of any article of food or commerce from holding the same for higher prices, provided he does not combine or confederate with others thus to raise or lower prices.
"Sec. 4. Be it further enacted, That it shall be the duty of the circuit and city courts to give this act in special charge to the several grand juries of the state."
(Emphasis added.) Act No. 202 was codified in the Alabama Code of 1896 as Chapter 196, Article 5, § 5557, § 5558, and § 5559:

*325 "5557. Forming pools or combinations to regulate the quantity or price of products.Any person or corporation, who engages or agrees with other persons or corporations, or enters into, directly or indirectly, any combination, pool, trust, or confederation, to regulate or fix the price of any article or commodity to be sold within this state for speculation, or any person or corporation who enters into, becomes a member of, or party to, any pool, agreement, combination, or confederation to fix or limit the quantity of any article or commodity to be produced, manufactured, mined, or sold in this state, must, on conviction, be fined not less than five hundred, nor more than two thousand dollars.
"5558. Combinations to control corporations with intent to fix the price or production of commodities. Any corporation chartered under the laws of this state, or any officer, stockholder, agent, or employe of any such corporation, which enters into any combination with any other corporation or person with the intent to place the management or control of any such corporation in the hands of another corporation or person and thereby limit or fix the price, or restrict or diminish the production, manufacture, sale, use, or consumption of any article of commerce, must, on conviction, be fined not less than five hundred, nor more than two thousand dollars.
"5559. Preceding two sections given in special charge to grand juries. The preceding two sections must be given in special charge to the grand jury."
What clearly stands out with respect to the 1896 codification of Act No. 202 is the change in phraseology in § 5557, specifically, the deletion of the words "within this state," which had appeared as the 20th, 21st, and 22nd words of Act No. 202. This change was made by William L. Martin, Alabama's Code commissioner. Pursuant to Ala. Acts 1894-95, Act No. 507, § 1, p. 1001, Martin was given the authority to "revise, digest and codify all of the statutes of this state of a general and public nature, both civil and criminal." Act No. 507 specifically provided as follows:
"Sec. 3. Be it further enacted, That it shall be the duty of the said commissioner, at least three months before the meeting of the next general assembly to deliver said code to the governor of this state, together with a sworn statement, showing all the changes he shall have made in the phraseology of all the acts and laws codified by him, including additions thereto and omission therefrom, with accurate reference to the acts and laws so altered or changed; and it shall be the duty of the governor carefully to examine the same, and to specifically report upon the same to the succeeding general assembly, recommending such alterations if any, as to him may seem proper; and attaching to his report the sworn statement of the commissioner herein provided for.
"Sec. 4. Be it further enacted, That said commissioner shall prepare appropriate chapters, titles, and subdivisions of titles for each chapter, clearly and briefly expressive of the subjects treated, which shall be arranged alphabetically, bringing into each chapter as near as may be, a condensation of all public laws, appertaining to the subject treated in each chapter: that said commissioner shall not simply transfer or transcribe the laws, but shall (without changing the sense) so alter the phraseology as to exclude all redundancy, or obscurity of expression, and where there shall be several acts relating to the same subject, they shall be condensed into one, and so expressed, as clearly to set forth the sense of the whole, having regard to judicial exposition thereof: that whenever it shall be apparent that there may be legislative omissions in any statute, said commissioner shall supply the same, so as to perfect such statute, and render its operation complete, and shall add all *326 such original notes and references as shall be proper for the clear elucidation of them, and for easy reference to the several laws from which they may be compiled, showing as far as may be, when such acts and statutes become operative, when amended, with foot notes of all decisions of the supreme court, construing or mentioning such sections or acts, and as far as practicable, a brief and concise statement of the question decided by such decisions."
In his report to the Governor, on page 111, Martin stated as follows:
"CHAPTER 195. TRADE, PUBLIC POLICY AND POLICE.
". . . .
"5549, 5550, 5551. Based on the act of February 7, 1891page 438. To prohibit pools, trusts, etc. Re-written with such changes as were necessary in phraseology."
We note that Act No. 202, dealing with the prohibition of "pools, trusts, etc.," was codified as Article 5, § 5557, § 5558, and § 5559 of Chapter 196 of the 1896 Code, not as § 5549, § 5550, and § 5551, of Chapter 195. Notwithstanding these apparent errors, Martin did specifically state that he had rewritten "the act of February 7, 1891page 438" (Act No. 202) so as to make "such changes as were necessary in phraseology." Neither the Governor nor the Legislature made any changes to § 5557, § 5558, or § 5559 before the Legislature adopted the 1896 Code.
Article IV, § 103, of the Constitution of Alabama of 1901 provided:
"The legislature shall provide by law for the regulation, prohibition, or reasonable restraint of common carriers, partnerships, associations, trusts, monopolies, and combinations of capital, so as to prevent them or any of them from making scarce articles of necessity, trade, or commerce, or from increasing unreasonably the cost thereof to the consumer, or preventing reasonable competition in any calling, trade, or business." This constitutional mandate, Rogers v. City of Mobile, 277 Ala. 261, 169 So.2d 282 (1964), resulted in the Legislature's readopting § 5557, § 5558, and § 5559 of the 1896 Code in substantially the same form in the 1907 Code as § 7579, § 7580, and § 7582:
"7579. (5557) Forming pools or combinations to regulate the quantity or price of products.Any person or corporation who engages or agrees with other persons or corporations, or enters into, directly or indirectly, any combination, pool, trust, or confederation, to regulate or fix the price of any article or commodity to be sold or produced within this state, or any person or corporation who enters into, becomes a member of, or party to, any pool, agreement, combination, or confederation, to fix or limit the quantity of any article or commodity to be produced, manufactured, mined, or sold, in this state, must, on conviction, be fined not less than five hundred nor more than two thousand dollars.
"7580. (5558) Combinations to control corporations with intent to fix the price or production of commodities. Any corporation chartered under the laws of this state, or any officer, stockholder, agent, or employe of any such corporation, which enters into any combination with any other corporation or person with the intent to place the management or control of any such corporation in the hands of another corporation or person, and thereby limit or fix the price, restrict or diminish the production, manufacture, sale, use, or consumption of any article of commerce, must, on conviction, be fined not less than five hundred nor more than two thousand dollars.
". . . .
"7582. (5559) Four preceding sections given in special charge to grand juries.The four preceding sections must be given in special charge to the grand jury."
*327 The Legislature also added the following provision, which appeared as § 7581 of Chapter 273 of the 1907 Code:
"7581. Monopolies, penalty for. Any person or corporation, domestic or foreign, which shall restrain or attempt to restrain the freedom of trade or production, or which shall monopolize or attempt to monopolize the production, control, or sale of any commodity, or the prosecution, management, or control of any kind, class, or description of business; or which shall destroy, or attempt to destroy, competition in the manufacture or sale of a commodity, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than five hundred nor more than two thousand dollars for each offense."
In addition to these criminal antitrust provisions, in the 1907 Code the Legislature, for the first time, provided for a civil cause of action for injuries resulting from the effects of a trust, combine, or monopoly:
"2487. Actions against trusts, combines, or monopolies.Any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of five hundred dollars and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly; and may maintain the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly. And all such actions may be prosecuted to final judgment or decree against any one or more of the defendants thereto, notwithstanding there may be a dismissal, acquittal, verdict, judgment, or decree in favor of one or more of the defendants.
"2488. County in which action brought.Actions under the preceding section may be brought in any county where the trust, combine, or monopoly was formed, or where it exists or is carried on, promoted, operated, practiced, employed, used, or enjoyed; or in any county in which either of the defendants may have a domicile, or where an officer or agent of any defendant corporation may be found."
Section 7579, § 7580, § 7581, and § 7582 of the 1907 Code were carried forward in substantially the same form into the 1923 Code as § 5212, § 5213, § 5214, and § 5215, respectively:
"5212. (7579) (5557) Forming pools or combinations to regulate the quantity or price of products.Any person or corporation who engages or agrees with other persons or corporations, or enters into, directly or indirectly, any combination, pool, trust, or confederation, to regulate or fix the price of any article or commodity to be sold or produced within this state, or any person or corporation who enters into, becomes a member of, or party to, any pool agreement, combination, or confederation, to fix or limit the quantity of any article or commodity to be produced, manufactured, mined, or sold, in this state, must, on conviction, be fined not less than five hundred, nor more than two thousand dollars.
"5213. (7580) (5558) Combinations to control corporations with intent to fix the price or production of commodities. Any corporation chartered under the laws of this state, or any officer, stockholder, agent or employe of any such corporation, which enters into any combination with any other corporation or person with the intent to place the management or control of any such corporation in the hands of another corporation or person, and thereby limit or fix the price, restrict or diminish the production, manufacture, sale, use or consumption of any article of commerce, must, on conviction, be fined not less than five hundred nor more than two thousand dollars.

*328 "5214. (7581) Monopolies, penalty for. Any person or corporation, domestic or foreign, which shall restrain or attempt to restrain the freedom of trade or production, or which shall monopolize or attempt to monopolize the production, control, or sale of any commodity, or the prosecution, management, or control of any kind, class, or description of business; or which shall destroy or attempt to destroy, competition in the manufacture or sale of a commodity, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than five hundred nor more than two thousand dollars for each offense.
"5215. (7582) Three preceding sections given in special charge to grand juries.The three preceding sections must be given in special charge to the grand jury."
Section 2487 and § 2488 of the 1907 Code (providing for a civil cause of action) were carried forward in substantially the same form into the 1923 Code as § 5697 and § 5698:
"5697. (2487) Actions against trusts, combines, or monopolies. Any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of five hundred dollars and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly; and may maintain the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly. And all such actions may be prosecuted to final judgment or decree against any one or more of the defendants thereto, notwithstanding there may be a dismissal, acquittal, verdict, judgment, or decree in favor of one or more of the defendants.
"5698. (2488) County in which action brought.Actions under the preceding section may be brought in any county where the trust, combine, or monopoly was formed, or where it exists or is carried on, promoted, operated, practiced, employed, used, or enjoyed; or in any county in which either of the defendants may have a domicile, or where an officer or agent of any defendant corporation may be found."
Section 5212, § 5213, and § 5214 of the 1923 Code were carried forward in substantially the same form into the 1940 Code as Title 57, § 106, § 107, and § 108, respectively:
"§ 106. (5212) (7579) (5557) Forming pools or combinations to regulate the quantity or price of products. Any person or corporation who engages or agrees with other persons or corporations, or enters into, directly or indirectly, any combination, pool, trust, or confederation, to regulate or fix the price of any article or commodity to be sold or produced within this state, or any person or corporation who enters into, becomes a member of, or party to, any pool agreement, combination, or confederation, to fix or limit the quantity of any article or commodity to be produced, manufactured, mined, or sold, in this state, must, on conviction, be fined not less than five hundred, nor more than two thousand dollars.
"§ 107. (5213) (7580) (5558) Combinations to control corporations with intent to fix the price or production of commodities.Any corporation chartered under the laws of this state, or any officer, stockholder, agent or employee of any such corporation, which enters into any combination with any other corporation or person with the intent to place the management or control of any such corporation in the hands of another corporation or person, and thereby limit or fix the price, restrict or diminish the production, manufacture, sale, use or consumption of any article of commerce, *329 must, on conviction, be fined not less than five hundred nor more than two thousand dollars.
"§ 108. (5214) (7581) Monopolies, penalty for.Any person or corporation, domestic or foreign, which shall restrain or attempt to restrain the freedom of trade or production, or which shall monopolize or attempt to monopolize the production, control, or sale of any commodity, or the prosecution, management, or control of any kind, class, or description of business; or which shall destroy or attempt to destroy, competition in the manufacture or sale of a commodity, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than five hundred nor more than two thousand dollars for each offense."
Section 5697 and § 5698 of the 1923 Code (providing for a civil cause of action) were carried forward in substantially the same form into the 1940 Code as Title 7, § 124 and § 125:
"§ 124. (5697) (2487) Actions against trusts, combines, or monopolies. Any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of five hundred dollars and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly; and may maintain the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly. And all such actions may be prosecuted to final judgment or decree against any one or more of the defendants thereto, notwithstanding there may be a dismissal, acquittal, verdict, judgment, or decree in favor of one or more of the defendants.
"§ 125. (5698) (2488) County in which action brought.Actions under the preceding section may be brought in any county where the trust, combine, or monopoly was formed, or where it exists or is carried on, promoted, operated, practiced, employed, used, or enjoyed; or in any county in which either of the defendants may have a domicile, or where an officer or agent of any defendant corporation may be found."
Section 106, § 107, and § 108 of Title 57 of the 1940 Code were carried forward in substantially the same form into the 1975 Code as § 8-10-1, § 8-10-2, and § 8-10-3, respectively:
"[§ 8-10-1] Any person or corporation who engages or agrees with other persons or corporations or enters, directly or indirectly, into any combination, pool, trust, or confederation to regulate or fix the price of any article or commodity to be sold or produced within this state or any person or corporation who enters into, becomes a member of or party to any pool agreement, combination, or confederation to fix or limit the quantity of any article or commodity to be produced, manufactured, mined, or sold in this state must be fined, on conviction, not less than $500 nor more than $2,000."
"[§ 8-10-2] Any corporation chartered under the laws of this state or any officer, stockholder, agent, or employee of any such corporation which enters into any combination with any other corporation or person with the intent to place the management or control of any such corporation in the hands of another corporation or person and thereby limit or fix the price, restrict or diminish the production, manufacture, sale, use, or consumption of any article of commerce must be fined, on conviction, not less than $500 nor more than $2,000."
"[§ 8-10-3] Any person or corporation, domestic or foreign, which shall *330 restrain, or attempt to restrain, the freedom of trade or production, or which shall monopolize, or attempt to monopolize, the production, control, or sale of any commodity or the prosecution, management, or control of any kind, class, or description of business or which shall destroy, or attempt to destroy, competition in the manufacture or sale of a commodity shall be guilty of a misdemeanor and, upon conviction, shall be fined not less than $500 nor more than $2,000 for each offense."
Section 124 and § 125 of Title 7 of the 1940 Code (providing for a civil cause of action) were carried forward in substantially the same form into the 1975 Code as subsections (a) and (b), respectively, of § 6-5-60.
With this legislative history in mind, we move next to the state of federal constitutional law at the time Alabama's antitrust statutes were originally enacted. In 1 ABA Antitrust Law Section, State Antitrust Practice and Statutes Introduction-20 (1990), we find the following:
"An important factor in most early state antitrust cases was the prevailing `dual sovereignty' theory of state-federal regulatory authority. This theory postulated distinct and mutually exclusive zones of jurisdiction for the states, which exercised jurisdiction only over purely intrastate matters, and the federal government, which exercised jurisdiction only over goods and services in inter-state commerce."
(Emphasis in original.) See, also, Lawrence H. Tribe, American Constitutional Law, § 5-4, at 307-08 (2d ed.1988) (discussing the United States Supreme Court's varying approaches to interpreting the Commerce Clause, Article I, § 8, of the United States Constitution, but specifically noting the consistent dichotomy maintained by that Court between interstate commerce and intrastate commerce prior to the New Deal). This dichotomy between interstate commerce and intrastate commerce is clearly illustrated in a series of cases decided by the Court between 1888 and 1899. See Bowman v. Chicago & N.W. Ry., 125 U.S. 465, 493, 8 S.Ct. 689, 31 L.Ed. 700 (1888) ("[A] State has legislative control, exclusive of Congress, within its territory, of all persons, things, and transactions of strictly internal concern.... It cannot, without the consent of Congress, expressed or implied, regulate commerce between its people and those of the other States of the Union in order to effect its end, however desirable such a regulation might be."); Brennan v. Titusville, 153 U.S. 289, 302, 14 S.Ct. 829, 38 L.Ed. 719 (1894) ("we think it must be considered, in view of a long line of decisions, that it is settled that nothing which is a direct burden upon interstate commerce can be imposed by the State without the assent of Congress"); United States v. E.C. Knight Co., 156 U.S. 1, 12, 15 S.Ct. 249, 39 L.Ed. 325 (1895) ("That which belongs to commerce [between the States] is within the jurisdiction of the United States, but that which does not belong to commerce is within the jurisdiction of the police power of the State."[3]); Addyston *331 Pipe & Steel Co. v. United States, 175 U.S. 211, 233, 20 S.Ct. 96, 44 L.Ed. 136 (1899) (also involving an alleged violation of the Sherman Antitrust Act) ("[e]ach state ... would have complete jurisdiction over the commerce which was wholly within its own borders, while the jurisdiction of Congress, under the provisions of the Constitution, over interstate commerce would be paramount, and would include therein jurisdiction over contracts [in restraint of such commerce]"); see, also, W.W. Thomas, A Treatise on Combinations in Restraint of Trade, § 90-91, at 229, 232 (2d ed. 1928) ("Congress has no control over intrastate commerce.... No state may in any way enact legislation which in any wise controls, regulates, or infringes on interstate commerce.").[4]
*332 One of the best discussions of the prevailing dual-sovereignty theory of state-federal regulatory authority at the turn of the century is found in Justice Stewart's dissenting opinion in Cantor v. Detroit Edison Co., 428 U.S. 579, 632-36, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). In Cantor, the Supreme Court was called upon to decide whether Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), which had held that the Sherman Antitrust Act was not violated by state action displacing competition in the marketing of raisins, immunized private action that had been approved by a state regulatory agency and that had to continue while the state approval remained effective. Justice Stewart's historical analysis of the legislative history of the Sherman Antitrust Act, which was not in dispute, reads as follows:
"The floor debates and the House Report on the proposed legislation [the Sherman Antitrust Act] clearly reveal, as at least one commentator has noted, that `Congress fully understood the narrow scope given to the commerce clause' in 1890. This understanding is, in many ways, of historic interest only, because subsequent decisions of this Court have `permitted the reach of the Sherman Act to expand along with expanding notions of congressional power.' But the narrow view taken by the Members of Congress in 1890 remains relevant for the limited purpose of assessing their intention regarding the interaction of the Sherman Act and state economic regulation.
"The legislative history reveals very clearly that Congress' perception of the limitations of its power under the Commerce Clause was coupled with an intent not to intrude upon the authority of the several States to regulate `domestic' commerce. As the House Report stated:
"`It will be observed that the provisions of the bill are carefully confined to such subjects of legislation as are clearly within the legislative authority of Congress.
"`No attempt is made to invade the legislative authority of the several States or even to occupy doubtful grounds. No system of laws can be devised by Congress alone which would effectually protect the people of the United States against the evils and oppression of trusts and monopolies. Congress has no authority to deal, generally, with the subject within the States, and the States have no authority to legislate in respect of commerce between the several States or with foreign nations.
"`It follows, therefore, that the legislative authority of Congress and that of the several States must be exerted to secure the suppression of restraints upon trade and monopolies. Whatever legislation Congress may enact on this subject, within the limits of its authority, will prove of little value unless the States shall supplement it by such auxiliary and proper legislation *333 as may be within their legislative authority.'
"Similarly, the floor debates on the proposed legislation reveal an intent to `g[o] as far as the Constitution permits Congress to go,' in the words of Senator Sherman, conjoined with an intent not to `interfere with' state-law efforts to `prevent and control combinations within the limit of the State.' Far from demonstrating an intent to pre-empt state laws aimed at preventing or controlling combinations or monopolies, the legislative debates show that Congress' goal was to supplement such state efforts, themselves restricted to the geographic boundaries of the several States. As Senator Sherman stated: `Each State can deal with a combination within the State, but only the General Government can deal with combinations reaching not only the several States, but the commercial world. This bill does not include combinations within a State....' Indeed a preexisting body of state law forbidding combinations in restraint of trade provided the model for the federal Act. As Senator Sherman stated with respect to the proposed legislation: `It declares that certain contracts are against public policy, null and void. It does not announce a new principle of law, but applies old and well-recognized principles of the common law to the complicated jurisdiction of our State and Federal Government. Similar contracts in any State in the Union are now, by common or statute law, null and void.'
"It is noteworthy that the body of state jurisprudence which formed the model for the Sherman Act coexisted with state laws permitting regulated industries to operate under governmental control in the public interest. Indeed, state regulatory laws long antedated the passage of the Sherman Act and had, prior to its passage, been upheld by this Court against constitutional attack. Such laws were an integral part of state efforts to regulate competition to which Congress turned for guidance in barring restraints of interstate commerce, and it is clear that those laws were left undisturbed by the passage of the Sherman Act in 1890. For, as congressional spokesmen expressly stated, there was no intent to `interfere with' state laws regulating domestic commerce or `invade the legislative authority of the several States....'
"As previously noted, the intent of the draftsmen of the Sherman Act not to intrude on the sovereignty of the States was coupled with a full and precise understanding of the narrow scope of congressional power under the Commerce Clause, as it was then interpreted by decisions of this Court. Subsequent decisions of the Court, however, have permitted the `jurisdictional' reach of the Sherman Act to expand along with an expanding view of the commerce power of Congress. See Hospital Building Co. v. Rex Hospital Trustees, 425 U.S. 738, 743 n. 2, 96 S.Ct. 1848, 48 L.Ed.2d 338, and cases cited therein. These decisions, based on a determination that Congress intended to exercise all the power it possessed when it enacted the Sherman Act, have in effect allowed the Congress of 1890 the retroactive benefit of an enlarged judicial conception of the commerce power.
"It was this retroactive expansion of the jurisdictional reach of the Sherman Act that was in large part responsible for the advent of the Parker doctrine. Parker involved a program regulating the production of raisins within the State of California. Under the original understanding of the draftsmen of the Sherman Act, such in-state production, like in-state manufacturing, would not have been subject to the regulatory power of Congress under the Commerce Clause and thus not within the `jurisdictional' reach of the Sherman Act. See United States v. E.C. Knight Co., 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325. If the state of the law had remained static, the Parker problem would rarely, if ever, *334 have arisen. As stated in Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679, the operative premise would have been that the `Anti-Trust Act ... prescribe[d] ... a rule for interstate and international commerce, (not for domestic commerce,)' id., at 337, 24 S.Ct. 436. The relevant question would have been whether the anticompetitive conduct required or permitted by the state statute was in restraint of domestic or interstate commerce. If the former, the conduct would have been beyond the reach of the Sherman Act; if the latter, the conduct would probably have violated the Sherman Act, regardless of contrary state law, on the theory that `[n]o State can, by ... any ... mode, project its authority into other States, and across the continent, so as to prevent Congress from exerting the power it possesses under the Constitution over interstate and international commerce, or ... to exempt its corporation engaged in interstate commerce from obedience to any rule lawfully established by Congress for such commerce.' Id., at 345-346, 24 S.Ct. 436."
428 U.S. at 632-36, 96 S.Ct. 3110 (Stewart, J., dissenting) (emphasis in Justice Stewart's opinion).
An Alabama appellate court first dealt with the scope of this state's antitrust statutes in 1913. In Georgia Fruit Exchange v. Turnipseed, supra, the defendant in a breach-of-contract action defended on the ground that the contract was illegal and void as in restraint of trade and against public policy. The Court of Appeals upheld the trial court's order sustaining the defendant's demurrer to the complaint, stating:
"Section 23 of our Constitution forbids the granting of exclusive and irrevocable special privileges and immunities by the Legislature, and section 103 thereof, which is a provision new to the Constitution of 1901, enjoins positively upon the Legislature the duty of providing by law for the `regulation, prohibition, or reasonable restraint of common carriers, partnerships, associations, trusts, monopolies, and combinations of capital, so as to prevent them or any of them from making scarce articles of necessity, or increasing unreasonably the costs thereof to the consumer, or preventing reasonable competition in any trade, calling or business.' In pursuance of this latter provision the Legislature of this state, following the lead of other states, has passed the act now embraced in sections 7579, 7580, and 7581 of the Code, patterned after a similar statute in Illinois and other states and akin to the federal statute, known as the Sherman Anti-Trust Act of July 2, 1890, c. 647, 26 Stat. 209 (U.S.Comp.St. 1901, p. 3200).
"Said section 7579 of our Code thus provides: `Any person or corporation who engages or agrees with other persons or corporations, or enters into, directly or indirectly, any combination, pool, or trust, or confederation to regulate or fix the price of any article or commodity to be sold or produced within this state, or ... must, on conviction, be fined,' etc.
"Section 7581 reads: `Any person or corporation, domestic or foreign, which shall restrain or attempt to restrain the freedom of trade or production, or which shall monopolize or attempt to monopolize the production, control or sale of any commodity, or ... shall be fined,' etc.
"The Sherman Anti-Trust Act makes illegal, punishing the parties thereto by fine or imprisonment, `every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states or with foreign nations,' etc.
"There being thus both a state and national law prohibiting unlawful combinations in restraint of tradethe one law relating to intrastate, the other to interstate, commerceit is immaterial as to which character of commerce, *335 whether only one or both, is involved in the contract here under consideration; for if the contract is in violation of either law it is void as contravening a positive statute; and, even if it does not go to the extent of being in actual violation of either statute, yet if it tends to create a monopoly by unreasonably restraining trade, it is still void under our law, as at common law, as being against public policy. Arnold v. Jones, 152 Ala. 501, 44 South. 662, 12 L.R.A. (N.S.) 150; 2 May. Dig. 784; 5 May. Dig. 218; 6 May. Dig. 182, where the authorities are cited."
9 Ala.App. at 131-33, 62 So. at 545-46. (Emphasis added.)
This Court first considered the application of Alabama's antitrust statutes in Dothan Oil Mill Co. v. Espy, supra. The defendants in that case were Alabama manufacturers of cottonseed oil "in different localities in this state" and were "the only buyers in Alabama of any appreciable amount of cotton-seed offered for sale in the State." 220 Ala. at 606-07, 127 So. at 179-80. The plaintiffs, Alabama cotton ginners, alleged that the defendants had "agreed among themselves the price to be paid for cotton-seed throughout the State of Alabama." 220 Ala. at 606, 127 So. at 179. The defendants argued that the trial court lacked subject-matter jurisdiction, on the ground that the challenged conspiracy to control the price of cottonseed involved interstate commerce. The defendants based their argument on the fact that a portion of the products that were manufactured from cottonseed were sold outside Alabama. This Court rejected the defendants' argument, stating:
"We are not of [the] opinion, however, that the business of buying cotton seed, confined wholly to the state, to be crushed and manufactured into oil and other products, in such state, constitutes interstate commerce, within the scope and purpose of [the Federal Trade Commission Act] or within the sense of the Sherman and Clayton Acts (15 [U.S.C.] §§ 1-7, 15, and sections 12-27, 44) which confer on the federal courts exclusive jurisdiction to enforce said acts, though some of the manufactured products may eventually find their way into and become commodities of interstate commerce. `The fact, of itself, that an article when in the process of manufacture is intended for export to another state does not render it an article of interstate commerce.' Crescent Cotton Oil Co. v. State of Mississippi, 257 U.S. 129, [135], 42 S.Ct. 42, 44, 66 L.Ed. 166; Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715; New York Central R.R. Co. v. Mohney, 252 U.S. 152, 40 S.Ct. 287, 64 L.Ed. 502, 9 A.L.R. 496."
220 Ala. at 610, 127 So. at 182. Thus, the essence of this Court's decision in Espy was that the plaintiffs' complaint stated a state-law antitrust claim because the alleged illegal conduct involved only commercial transactions wholly confined to Alabama.
This Court next commented on Alabama's antitrust statutes in Ex parte Rice, supra. That case involved an original petition for a writ of mandamus to require the trial court to vacate its order overruling the plaintiffs' motion to compel answers to interrogatories. The underlying action was filed by the Sinclair Refining Company and sought the specific performance of a contract. The defendant raised as a defense that the contract was illegal, arguing that its "purpose was to engage in a monopoly in violation of the state and federal law." 259 Ala. at 572, 67 So.2d at 826. This Court denied mandamus relief, holding that the motion to compel had been properly denied because the interrogatories filed by the defendant sought to place an improper burden on the plaintiff. In the course of its discussion of the applicable law, this Court noted:
"We do not seem to have in Alabama a statute which defines an unlawful monopoly. Section 108, Title 57, Code, makes it a crime, punishable by fine, for any person, including a corporation, to *336 restrain trade or create a monopoly. Section 103 of the Constitution requires legislation to prohibit monopolies and combinations. Section 78, Title 57, Code, makes lawful certain contracts fixing a minimum resale price. We have applied the common law, which is substantially as set out in the Sherman and Clayton Acts. See Sherrill v. Alabama Appliance Co., 240 Ala. 46(7), 197 So. 1.
"The federal statutes, Sherman and Clayton Acts, prescribe the terms of unlawful monopolies and restraints of trade as they should also be administered in Alabama. The question, therefore, is properly affected by those acts, and it must be controlled by them when the business involved in the suit affects interstate commerce. It is upon that basis that the foregoing conclusions prevail in this case."
259 Ala. at 575, 67 So.2d at 829. (Emphasis added.)
In San Ann Tobacco Co. v. Hamm, supra, this Court addressed the constitutionality of an amendment to the Alabama Unfair Cigarette Sales Act, Ala. Acts 1951, Act No. 805, as amended in 1965 by Ala. Acts 1965, Act No. 78, p. 105, Second Special Session. In striking down the amendment as violating § 1 and § 35 of the Alabama Constitution, this Court wrote:
"This Court held the original Act to be constitutional on its face, Simonetti, Inc. v. State ex rel. Gallion, 272 Ala. 398, 132 So.2d 252, and appellants do not attack that holding. But appellants do argue that one part of the 1965 amendment does render the Act unconstitutional on its face.
"The pertinent part of § 3(a) (Tit.57, § 83(3)) of the original Act provided:
"`It shall be unlawful for any wholesaler or retailer, with intent to injure competitors, destroy or substantially lessen competition, to advertise, offer to sell, or sell at wholesale or retail, cigarettes at less than cost to such wholesaler or retailer as the case may be.'
"This sentence was amended in 1965 and we emphasize the five additional words added which are pertinent to this decision:
"`It shall be unlawful for any wholesaler or retailer with intent to injure competitors, destroy or substantially lessen competition, or with the effect thereof, to advertise, offer to sell or sell at wholesale or retail cigarettes at less than cost to such wholesaler or retailer as the case may be....'
"We quote excerpts from the decision in Simonetti, Inc. v. State ex rel. Gallion, supra:
"`"The present bill directly alleges a dual or cumulative specific intent to `injure competitors and destroy or substantially lessen competition' and that respondent's advertising, offers to sell, and sale of cigarettes at wholesale have been `at less than cost to said respondent.' These are considered to be allegations of ultimate, issuable facts, sufficient for the purpose of pleading, since the respondent's actual intent in fact, its costs, and its selling prices are presumably matters within its knowledge, and greater particularity would not seem to be required either to frame the issue or inform respondent of the charge against which it is required to defend. By these allegations, the State as complainant assumes a heavy burden of proof, since it must be proof of far more than mere intent of injury to competitors or `unfairness' of competition. It must also prove, under the construction placed upon the Act, a selling below cost with the specific intent of destroying or substantially lessening competition, since the Act, if valid at all, can only be held so as an exercise of the police power of the state over intrastate commerce to the end of inhibiting practices tending toward monopolization."'"
*337 283 Ala. at 400, 217 So.2d at 804-05. (Some emphasis original; other emphasis added.)
At least three federal courts have followed the aforementioned line of Alabama decisions and have declined to interpret Alabama's antitrust statutes as reaching transactions involving interstate commerce. See In re Brand Name Prescription Drugs Antitrust Litigation, supra (district court denying motion to remand to state court, stating that "[i]t is clear that the statute [§ 6-5-60] applies only to intrastate activity");[5]In re NASDAQ Market Makers Antitrust Litigation, supra, at 179 (denying motion to remand and noting that "the Alabama state courts have deemed the Alabama antitrust statutes upon which the complaint is based to regulate only intrastate commerce"); and Warren v. Playmobil U.S.A., Inc., supra (denying motion to remand, concluding that "the Alabama statutes the plaintiff purports to rely upon [§ 6-5-60, § 8-10-1, and § 8-10-3] regulate only intrastate commerce").
After carefully reviewing the record and the briefs (which, we note, were exceptionally well written), we conclude that the rationale of Siegelman (that because the states were prohibited by federal law from taxing out-of-state national banks at the time the statute levying the excise tax was first enacted, the state could not tax an out-of-state national bank under the existing tax statute in the absence of further action by the Legislature) is equally applicable in the present case. Although what is now § 6-5-60 (providing for a civil cause of action) was enacted a little over 16 years after what are now § 8-10-1, *338 § 8-10-2, and § 8-10-3 (prescribing criminal penalties), all of these statutes are part of a uniform system of regulation, in the sense that they are all directed toward punishing or providing redress for activities in restraint of trade. Related statutes of this kind should, when possible, be construed in pari materia. Jordan v. Reliable Life Insurance Co., 589 So.2d 699 (Ala.1991), citing N. Singer, Sutherland Statutory Construction, § 70.05, at 505 (4th ed.1986). It is significant, we think, that all of these antitrust provisions were first enacted at a time in this country's history when the United States Supreme Court maintained a clear dichotomy with respect to a state's power to regulate commerce. Our research indicates that at the time of the enactment of what are now § 8-10-1, § 8-10-2, and § 8-10-3 (1891), and extending through the time of the enactment in 1907 of what is now § 6-5-60, the United States Supreme Court had clearly held that the regulation of interstate commerce was within the exclusive domain of Congress. It is also significant that a federal antitrust law (the Sherman Antitrust Act) was already in effect at the time of the enactment of what are now § 8-10-1, § 8-10-2, and § 8-10-3. Thus, under the rationale of Siegelman, we must entertain a strong presumption that the Alabama Legislature was aware toward the end of the 19th century and at the beginning of the 20th century, when it first enacted these antitrust statutes, that its ability to regulate antitrust activity was limited in that it did not have the power to directly regulate transactions involving interstate commerce. The United States Supreme Court had clearly signaled, however, that the regulation of intrastate commerce at the turn of the century was still largely within the exclusive domain of the states.
This presumption that the Legislature intended to limit the scope of its antitrust laws to transactions involving intrastate commerce is strengthened by several additional factors. First, the Illinois statute that formed the basis for what are now § 8-10-1, § 8-10-2, and § 8-10-3, was held early on by the Illinois Supreme Court to be limited to transactions involving intrastate commerce. See People ex rel. Akin v. Butler Street Foundry & Iron Co., 201 Ill. 236, 66 N.E. 349 (1903). Second, Act No. 202, § 1 (the predecessor of § 8-10-1), as originally enacted by the Legislature in 1891, read as follows:
"Section 1. Be it enacted by the General Assembly of Alabama, That any person, corporation or association of persons who shall, within this state, engage or agree with other persons, corporations or association of persons, or enter into, either directly [sic], any combination, pool, trust or confederation to regulate or fix the price of any article or commodity to be sold within this state for speculation; and any person, corporation or association of persons who shall enter into, become a member of a party to, any pool, agreement, combination or confederation to fix or limit the amount or quantity of any article or commodity to be produced or manufactured, mined or sold in this state, shall be guilty of a misdemeanor, and subject to indictment and punishment as herein provided."
(Emphasis added.) Although this fact is certainly not conclusive, this section, as originally worded, suggests that the Legislature intended to limit the scope of Alabama's antitrust regulations to transactions involving intrastate commerce. Although the Code commissioner deleted the words "within this state" from § 5557 during his compilation of the 1896 Code, we find in our research no indication that he had the authority or the intent to make any substantive changes to Act No. 202, or that the Legislature, by adopting the 1896 Code with the commissioner's suggested change to § 5557, contemplated that the deletion of the words would effect the kind of substantive change that the plaintiffs suggest was intendedto expand the scope of the statute to encompass transactions involving interstate *339 commerce. We find it more probable (although we certainly can never know for sure) that the commissioner deleted the words, and that the Legislature accepted that change, out of an understanding or belief that the state lacked extraterritorial authority over commerce and, therefore, that the words were not necessary. Third, and perhaps most important, the Court of Appeals stated in 1913, shortly after these statutes were enacted, that the Legislature's regulatory power over antitrust violations did not extend to transactions involving interstate commerce, specifically recognizing that the regulation of such transactions had been undertaken by Congress pursuant to the Sherman Antitrust Act. The understanding of the Court of Appeals in this respect has been echoed by this Court on every occasion on which it has considered the matter. Fourth, the Legislature, with presumptive knowledge of the interpretation placed on Alabama's antitrust laws by Alabama appellate courts, has made no substantive changes to any of Alabama's antitrust laws since their original enactment.
As previously noted, when circumstances surrounding the enactment of laws, such as the antitrust statutes at issue here, cast doubt on the otherwise clear language of the statutes themselves, we must look to other factors in determining legislative intent. Siegelman, supra. In an effort to avoid indulging in conjecture or searching for imaginary purposes with respect to these antitrust statutes, we have followed the well-settled rule of statutory construction "that it is permissible in ascertaining [the purpose and intent of a statute] to look to the history of the times, the existing order of things, the state of the law when the instrument was adopted, and the conditions necessitating such adoption." In re Upshaw, 247 Ala. at 223, 23 So.2d at 863. Having done that, we hold, based on the above, that § 6-5-60 does not provide a cause of action for damages allegedly resulting from an agreement to control the price of goods shipped in interstate commerce. We reiterate what we stated in Siegelman, supra:
"This Court's role is not to displace the legislature by amending statutes to make them express what we think the legislature should have done. Nor is it this Court's role to assume the legislative prerogative to correct defective legislation or amend statutes."
575 So.2d at 1051. We hold only that the field of operation of Alabama's antitrust statutes, specifically § 6-5-60, is no greater today than it was when the laws were first enacted. Thus, these statutes regulate monopolistic activities that occur "within this state"within the geographic boundaries of this stateeven if such activities fall within the scope of the Commerce Clause of the Constitution of the United States.[6] We leave to the Legislature the policy decision of whether to expand the reach of Alabama's antitrust statutes to activities that cross state boundaries.
The trial court's order denying the defendants' motion for a judgment on the pleadings is reversed, and the cause is remanded for further proceedings consistent with this opinion.
OPINION OF JULY 31, 1998, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, SEE, and BROWN, JJ., concur.
COOK and JOHNSTONE, JJ., dissent.
HOUSTON and LYONS, JJ., recuse themselves.
SEE, J., files statement of nonrecusal.
*340 COOK, Justice (dissenting).
I dissent from the majority's holding that § 6-5-60, Ala.Code 1975, does not provide a cause of action for damage occurring within Alabama and resulting from an unlawful agreement to control the price of goods shipped through interstate commerce into Alabama.
The issue presented by this appeal is whether the application of Alabama's antitrust law, § 6-5-60, to the in-state purchase of brand-name prescription drugs shipped from companies out-of-state is precluded because of the minimal presence of interstate commerce, which arguably invokes the Commerce Clause of the United States Constitution.[7] The actual focus is on the narrow issue of state-antitrust-law preclusion under the Commerce Clause.
Like the majority, I also believe a review of the legislative history of the statute is a necessary prerequisite to an analysis of the statute. Therefore, for a court to ascertain legislative intent, it is necessary to examine the plain language of the statute and to consider conditions existing when the Alabama antitrust laws were enacted. See Advertiser Co. v. Hobbie, 474 So.2d 93 (Ala.1985); League of Women Voters v. Renfro, 292 Ala. 128, 290 So.2d 167 (1974).
The time immediately before the enactment of the Sherman Antitrust Act in 1890 and the Alabama antitrust laws in 1891 was a period of high prices and reduced output.[8] According to Robert Lande, Congress's primary concern in 1890 was the abundance of wealth transfers away from consumers to the monopolist.[9] Senator Sherman and Senator John T. Morgan of Alabama described the abuse by trusts in 1890 as a predatory practice by the cottonseed-oil trust against competitors that injured customers by monopolistic price increases.[10] The Sherman Antitrust Act was passed on July 2, 1890, as a response to the unfair competitive practices against independent businesses that were occurring in the oil and railroad industries. In Standard Oil Co. of Kentucky v. Tennessee, 217 U.S. 413, 30 S.Ct. 543, 54 L.Ed. 817 (1910), a Kentucky corporation attempted to raise oil prices in Tennessee by persuading local merchants to cancel orders with that corporation's competitor located in Pennsylvania. The Kentucky corporation was convicted of violating the Tennessee antitrust act. On appeal to the United States Supreme Court, the defendant contended:
"[A]s the only illegal purpose that can be attributed to this agreement is that of protecting the defendant's oil against interstate competition, it could not be made the subject of punishment by the state; ... the offense, if any, is against interstate commerce alone."
217 U.S. at 421, 30 S.Ct. 543.
Justice Holmes responded by stating:
"The mere fact that it [the Tennessee Act] may happen to remove an interference with commerce among the States as well with the rest does not invalidate it. It hardly would be an answer to an indictment for forgery that the instrument forged was a foreign bill of lading, or for assault and battery that the person assaulted was engaged in peddling *341 goods from another State. How far Congress could deal with such cases we need not consider, but certainly there is nothing in the present state of the law at least that excludes the States from a familiar exercise of their power."
Id. at 422, 30 S.Ct. 543.
The Alabama legislature responded to the discontent and resentment of monopolistic practices in Alabama by enacting Alabama's first criminal antitrust law in 1891, Act No. 202, 1890-91 Ala. Acts 438 (presently codified at § 8-10-1, in substantial form), only one year after the passage of the Sherman Act. Act No. 202 provided:
"Section 1. Be it enacted by the General Assembly of Alabama, That any person, corporation or association of persons who shall, within this state, engage or agree with other persons, corporations or association of persons, or enter into, either directly [sic], any combination, pool, trust or confederation to regulate or fix the price of any article or commodity to be sold within this state for speculation; and any person, corporation or association of persons who shall enter into, become a member of a party to, any pool, agreement, combination or confederation to fix or limit the amount or quantity of any article or commodity to be produced or manufactured, mined or sold in this state, shall be guilty of a misdemeanor, and subject to indictment and punishment as herein provided.
"Sec. 2. Be it further enacted, That it shall not be lawful for any corporation chartered under the laws of Alabama, or for any officer, stockholder, agent or employee of such corporation to enter into any combination with other persons or corporations, the purpose and effect of which are to place the management or control thereof in the hands of others, with the purpose or intent to limit or fix the price, or lessen the production or sale of any article of commerce, use or consumption, or to restrict or diminish the manufacture of such article.
"Sec. 3. Be it further enacted, That any person or corporation violating the provisions of section one or two of this act, within the State of Alabama, shall, on conviction, be fined not less than five hundred dollars, nor more than two thousand dollars, at the discretion of the jury trying the same...."
(Emphasis added.)
Act No. 202 was codified in the 1896 Code, at Chapter 196, Article 5, § 5557, § 5558, and § 5559.[11] I note that in the 1896 codification of Act No. 202, the phrase "within this state" was omitted from § 5557. However, Act. No. 202, a criminal statute prohibiting pools, trusts, etc., was applicable only to criminal activity occurring in Alabama, because of the phrase "within this state." When this phrase was omitted in the 1896 codification of Act No. 202, the applicability of the statute only to criminal activity occurring within Alabama was not eliminated. Because Act No. 202 and its successor statutes are criminal in nature, they apply only to prohibited criminal activity in Alabama, regardless of whether the language of the statute provides for that result. Therefore, the omission of the phrase "within this state" is immaterial, because this criminal statute could not have regulated criminal activity occurring "outside Alabama."
The Alabama legislature, in the 1907 Code, Chapter 48, Article 6, § 2487 and *342 § 2488,[12] provided for a civil cause of action for injuries occurring from damage caused by an antitrust violation. Sections 2487 and 2488 provided:
"2487. Actions against trusts, combines, or monopolies.Any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of five hundred dollars and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly; and may maintain the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly. And all such actions may be prosecuted to final judgment or decree against any one or more of the defendants thereto, notwithstanding there may be a dismissal, acquittal, verdict, judgment, or decree in favor of one or more of the defendants.
"2488. County in which action brought.Actions under the preceding section may be brought in any county where the trust, combine, or monopoly was formed, or where it exists or is carried on, promoted, operated, practiced, employed, used, or enjoyed; or in any county in which either of the defendants may have a domicile, or where an officer or agent of any defendant corporation may be found."
On its face, § 6-5-60 does not indicate whether the statute applies to activities affecting both "intrastate" and "interstate" commerce. Unlike Act No. 202, the language in § 6-5-60 and its predecessors, §§ 2487 and 2488, are broadly written and give no indication whether the Alabama legislature intended for § 6-5-60 to apply to transactions occurring within Alabama but touching interstate commerce.
During the period following the enactment of the Sherman Antitrust Act, the United States Supreme Court described that Act as one aimed at preserving free and unfettered competition as the rule of trade. The Supreme Court declared any attempt by the states to regulate interstate commerce a burden on commerce and, therefore, unconstitutional. The United States Supreme Court "narrowly" defined interstate commerce as being within the exclusive realm of federal regulatory control.[13] The regulation of interstate commerce was deemed to be beyond the scope of state antitrust laws. See United States v. E.C. Knight Co., 156 U.S. 1, 11, 15 S.Ct. 249, 39 L.Ed. 325 (1895); Hadley-Dean Plate Glass Co. v. Highland Glass Co., 143 F. 242, 244 (8th Cir.1906); see also Brennan v. City of Titusville, 153 U.S. 289, 14 S.Ct. 829, 38 L.Ed. 719 (1894) (license tax imposed upon the defendant was a direct burden on interstate commerce and was beyond the power of the state); Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 228, 20 S.Ct. 96, 44 L.Ed. 136 (1899) ("The power to regulate interstate commerce is ... full and complete in Congress...."). However, I note that the United States Supreme Court has recognized that the Commerce Clause allows state regulation of activities that happen to affect interstate commerce, but which Congress has not regulated. See California v. Thompson, 313 U.S. 109, 113, 61 S.Ct. 930, 85 L.Ed. 1219 (1941) ("it has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce, but which because of their local character and their number and diversity *343 may never be adequately dealt with by Congress").
Because of the United States Supreme Court's narrow conception of interstate commerce during the time that the Sherman Act was enacted, our cases during that period, constrained by the Supremacy Clause, reflect those views. This Court viewed the federal Constitution as placing a barrier on the breadth of our antitrust laws, recognizing the then absolute power of Congress to exclusively regulate interstate commerce. Therefore, the Court did not have the need to interpret the "scope" of our antitrust laws. Instead, we accepted the status of federal constitutional law at that time and acknowledged its impact upon our state antitrust laws. See Dothan Oil Mill Co. v. Espy, 220 Ala. 605, 127 So. 178 (1930) (Alabamians' purchase of cottonseed from Alabama manufacturers to be used in Alabama did not constitute interstate commerce, even if some of the manufactured products eventually made their way into interstate commerce); Georgia Fruit Exchange v. Turnipseed, 9 Ala. App. 123, 62 So. 542, 546 (1913).
In Georgia Fruit Exchange v. Turnipseed, supra, the Georgia Fruit Exchange sued D.C. Turnipseed for breach of contract. In pertinent part, the contract stated:
"Penrode, Ala., March 10, 1909. In consideration of the benefits I expect to receive in common with all other fruit growers in Georgia by the organization of the Georgia Fruit Exchange, I hereby subscribe for membership and stock therein, and I hereby pledge to the Georgia Fruit Exchange, as follows: First, I agree to make all car load shipments of peaches grown by me during 1909, through the Georgia Fruit Exchange and pay 10 percent. of gross sales to cover all commission charges, remittance to be made by commission house direct to shipper, and the shipper reserving the right to designate by April 1 of each year the commission house in each market to which his consignments have been allotted. On orchard and other sales f.o.b. my station in consideration of a protected market and consequent enhanced price, I agree to pay the exchange 5 per cent. of such gross sales, and I further agree to abide by all the rules and regulations of the board of trustees of said exchange. Second, I hereby subscribe for and I agree to pay for on a basis of 10 per cent. Nov. 1, 1908, and 10 per cent. monthly thereafter on shares at $10 each of the stock of the Georgia Fruit Exchange aggregating $10. This agreement is not binding until $50,000 of stock is subscribed, and pledges secured covering 60 per cent of the prospective crop for 1909, based on 1908 shipments. D.C. Turnipseed."
See 9 Ala.App. at 125, 62 So. at 543.
The trial court entered a judgment for Turnipseed, and Georgia Fruit Exchange appealed. The Alabama Court of Appeals held that the contract at issue was void as being against public policy, because the contract's object was to prevent free and fair competition in trade. 9 Ala.App. at 143, 62 So. at 549. In its opinion, the court acknowledged the then bright-line distinction between state and federal antitrust laws.[14] The court stated:
"There being thus both a state and [a] national law prohibiting unlawful combinations in restraint of tradethe one law relating to intrastate, the other to interstate, commerceit is immaterial as to which character of commerce, whether only one or both, is involved in the contract here under consideration...."
Georgia Fruit Exchange, supra, at 132-33, 62 So. at 546.
However, the court refused to determine the scope of Alabama antitrust laws:
"It is not necessary to the invalidity of the contract here and to the disposition *344 of the present case to decide whether the contract is in violation of the state statute or of the federal statute, or any statute at all. We are not dealing with a criminal prosecution, and need not therefore concern ourselves with the question as to whether the commerce involved in the contract is inter or intra state, or both, or whether the terms of either statute have been violated. It is sufficient, as before seen, to destroy it and all obligations created by it, if it violates the public policy of the state or nation, as declared in judicial decisions predicated upon the principles of the common law obtaining here. It does contravene such public policy if it unreasonably restrains trade, because in such event it tends to create a monopoly, which is odious to our law and detrimental to public good, which requires freedom of trade and competition`the life of a people's prosperity.'"
9 Ala.App. at 142, 62 So. at 549 (emphasis added) (citation omitted).
We have interpreted our state antitrust laws and have decided our antitrust cases in accordance with the state of federal constitutional law existing at the time our antitrust laws were enacted. However, those cases are now of little precedential value because they were premised on strict adherence to the United States Supreme Court's mechanical intrastate-interstate view of the Commerce Clause. Although state antitrust law and federal antitrust law were seen as occupying separate fields during the period around 1890, it was not long before these two fields were almost concurrent. See Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (holding that although a small amount of wheat grown by a farmer was essentially consumed on his farm and some was sold locally, a marketing quota to control the price of wheat could be legitimately applied to the farmer); and Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (upholding the application of Title II of the Civil Rights Act to Ollie's barbecue restaurant in Birmingham, stating that the family-owned restaurant's purchase of $70,000 worth of meat that had originated out-of-state brought the restaurant under the Act and supported a constitutional exercise of Congress's commerce power over that purchase). The usefulness of the solely-intrastate-or-solely-interstate classification in 1890 has now been lost. It is almost inconceivable today for the sale of goods to be viewed solely as intrastate, because interstate commerce is affected if there is any arguable connection between a regulation and commerce that touches more than one state; this fact results in an overlap between state antitrust law and federal antitrust law. The fact that the Commerce Clause of the United States Constitution has historically dominated the field of regulating interstate commerce does not now prevent the application of state antitrust laws to activities affecting interstate commerce, given the recent broadening of the concept of interstate commerce. Another state court has wisely observed:
"Monopolies and restraints of trade are of infinite form and variety.... Some expend their efforts almost wholly upon intrastate commerce and are of only local interest and some almost wholly upon interstate commerce and so become matters of national concern, and there are all gradations between. In many cases it would be very difficult to draw the line. If State laws have no force as soon as interstate commerce begins to be affected, a very large area will be fenced off in which the States will be practically helpless to protect their citizens without, so far as we can perceive, any corresponding contribution to the national welfare.... Especially is this true in view of the immense broadening in the conception of interstate commerce in recent years."
Commonwealth v. McHugh, 326 Mass. 249, 265, 93 N.E.2d 751, 762 (1950).
*345 Because of the very nature of commerce and the expanding scope of transactions that affect interstate commerce, it stands to reason that the legislature intended for § 6-5-60 to apply to conduct occurring within Alabama but touching interstate commerce. Finding state preclusion whenever interstate commerce is involved would effectively destroy our state antitrust enforcement. Since the demise of the mechanical "dual-sovereignty" theory and the development of expansive federal power over activities merely "affecting" interstate commerce (see, e.g., Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 298, 65 S.Ct. 661, 89 L.Ed. 951 (1945) ["Congress, in passing the Sherman Act, left no area of its constitutional power unoccupied"]), the regulatory power of the national government has become so broad that, if it was fully exercised, virtually all intrastate activity might be regulated, to the complete exclusion of state authority. See, e.g., Perez v. United States 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) (loan-sharking); Heart of Atlanta Motel, Inc. v. United States 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (public accommodations). Therefore, if our state antitrust laws are deemed inapplicable to conduct occurring within Alabama but having interstate characteristics, our antitrust laws would become irrelevant, given that courts now recognize that most activities, however localized, have some effect, however remote, on interstate commerce.
The United States Supreme Court has consistently held that the Commerce Clause "does not exclude all state power of regulation" and that "there is a residuum of power in the state to make laws governing matters of local concern which nevertheless... affect interstate commerce or even ... regulate it." Southern Pacific Co. v. Arizona, 325 U.S. 761, 766-67, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945); see St. Joe Paper Co. v. Superior Court, 120 Cal. App.3d 991, 175 Cal.Rptr. 94 (1981), cert. denied, 455 U.S. 982, 102 S.Ct. 1489, 71 L.Ed.2d 691 (1982). The United States Supreme Court has also shown a long-time willingness to defer to state regulation. See Waters-Pierce Oil Co. v. Texas, 212 U.S. 86, 29 S.Ct. 220, 53 L.Ed. 417 (1909); Standard Oil Co. of Kentucky v. Tennessee, 217 U.S. 413, 30 S.Ct. 543, 54 L.Ed. 817 (1910); Straus v. American Publishers' Ass'n, 231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192 (1913). Therefore, Alabama is not precluded from exercising jurisdiction to enforce its own antitrust law unless its doing so places an undue burden on interstate commerce. See Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) (state not without power to regulate retail sale or distribution of gasoline).
Congress has also left unregulated the right of indirect purchasers to sue for damages under the Sherman Act. In Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Supreme Court barred indirect purchasers from bringing certain kinds of antitrust actions for damages under federal law, thereby leaving indirect purchasers seeking antitrust damages to sue under state law. However, like state antitrust statutes in many other states, Alabama's antitrust statute, § 6-5-60(a), expressly allows indirect purchasers to sue for antitrust damages. Because the United States Supreme Court expressly held in Illinois Brick that indirect purchasers lack standing to sue in federal courts under the Sherman Act, it is permissible for Alabama's antitrust laws to regulate activities that affect "interstate" commerce. Id.
Reflecting the United States Supreme Court's interpretation of the federal Constitution as allowing states to reach interstate commerce under their antitrust statutes and addressing the standing of indirect purchasers to sue under Alabama's antitrust laws, the United States Court of Appeals for the Seventh Circuit reversed the district court's judgment entered *346 in In re Brand Name Prescription Drugs Antitrust Litigation, [Ms. 94 C 897, Oct. 2, 1996] (N.D.Ill.1996) (not reported in F.Supp.). See In re Brand Name Prescription Drugs Antitrust Litigation, 123 F.3d 599 (7th Cir.1997). In that case, retail pharmacists filed an antitrust lawsuit against drug manufacturers and wholesalers of prescription drugs, challenging a price-fixing conspiracy. The drug manufacturers gave discounts only to favored customers, such as hospitals, HMOs, nursing homes, and mail-order companies. The manufacturer and a favored customer would enter a contract establishing a discounted price at which the customer would purchase prescription drugs from the wholesaler. After the customer purchased from the wholesaler at that price, the manufacturer reimbursed the wholesaler the difference between the regular wholesale price and the discounted price. The manufacturers argued that only the direct purchasers (wholesalers and others who purchased drugs directly from the manufacturers) could sue under the Sherman Act for overcharges, and not indirect purchasers (pharmacists who had purchased drugs from the wholesalers). The trial court entered a summary judgment for one of the manufacturers and denied the other manufacturers' summary-judgment motions. The Seventh Circuit reversed, holding, among other things, that the indirect-purchaser rule barred pharmacists' actions against manufacturers. In its discussion of an indirect purchaser's standing now to sue for damages under Alabama antitrust law, the court stated:
"If the [state] statute is limited today as it once was to commerce that is not within the regulatory power of Congress under the commerce clause, it is a dead letter because there are virtually no sales, in Alabama or anywhere else in the United States, that are intrastate in that sense. United States v. Lopez, 514 U.S. 549, 558, 115 S.Ct. 1624, 1630, 131 L.Ed.2d 626 (1995); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); United States v. Hicks, 106 F.3d 187, 189-90 (7th Cir.1997). Other states read their antitrust statutes to reach what it now understood to be interstate commerce.... The reading is constitutionally permissible, Clay v. Sun Ins. Office, Ltd., 377 U.S. 179, 84 S.Ct. 1197, 12 L.Ed.2d 229 (1964), and we are given no reason to suppose that Alabama would buck this trend and by doing so kill its statute."
In re Brand Name Prescription Drugs Antitrust Litigation, 123 F.3d at 613 (emphasis omitted).
Given the exclusive regulatory power over interstate commerce that Congress had under the Supreme Court's interpretation of the Commerce Clause at the time Alabama's antitrust statutes were enacted, which interpretation presumptively was known by the legislature, Alabama legislators, given the choice between a restrictive statute or a broad statute, chose to construct what is now § 6-5-60 with broad language. It is reasonable to assume that the legislature chose a broadly worded statute with the intent to afford maximum protection to the citizens of Alabama. It would be incongruous to interpret our state statute in a manner that would not provide maximum protection from unfair competitive practices, when the legislative history of the Sherman Antitrust Act evinces an intent to "supplement" state antitrust enforcement. Thus, continuing to interpret Alabama antitrust laws as applying only to purely intrastate commerce and as not applying to commerce with any hint of an interstate nature, is inconsistent with providing Alabamians maximum protection from unfair competition.
I do not think that to interpret our antitrust statute so as to provide Alabamians with maximum protection from unfair competition, as we are permitted to interpret it under the United States Constitution, is to treat the statute as an accordion. The language of § 6-5-60 has not *347 changed. However, we can now correctly read that section, in light of the reasoning in Brand Name Prescription Drugs, supra, to permit this claim by indirect purchasers; to do so, I think, would be to recognize that section's constitutionally permissible scope. It is Federal law, not Alabama state law, that is changing. My view of the scope of Alabama's antitrust statute is, therefore, not expansive; it would continue to apply our state law to conduct occurring within Alabama.
I believe the trial court correctly ruled that § 6-5-60 provides a cause of action for damages alleged to have resulted from a conspiracy to control the price of brandname prescription drugs shipped by out-of-state companies into Alabama. The conspiracy alleged in this case was directed toward an "intrastate" market and actually occurred within Alabama.
I therefore dissent.
JOHNSTONE, Justice (dissenting).
I respectfully dissent from the reversal of the trial judge's order for two reasons. First, the trial judge's denial of the defendants' motions for judgment on the pleadings does not conflict with the express holding by the majority. Second, the holding, to the extent that it be construed to require reversing the trial judge, is based on a misinterpretation of the federal constitutional law existing in 1907 when the statute invoked by the plaintiffs originated.
The majority holds, in pertinent part,
"that § 6-5-60 [Ala.Code 1975] does not provide a cause of action for damages allegedly resulting from an agreement to control the price of goods shipped in interstate commerce" and that "these [Alabama] statutes regulate monopolistic activities that occur `within this state' within the geographic boundaries of this stateeven if such activities fall within the scope of the Commerce Clause of the Constitution of the United States."
The plaintiffs' pleadings, which must be deemed true for the purpose of deciding a motion for judgment on the pleadings, expressly allege, in pertinent part, that the defendants violated § 6-5-60, Ala.Code 1975,
"by sending their agents and employees... into Alabama to make presentations to physicians, hospital administrators, HMO officers and administrators and others in the health-care field, and by marketing and selling their pharmaceutical products in this state either directly or through some or all of the defendant wholesalers, which pharmaceutical products ultimately were purchased by the named plaintiffs and members of the class at artificially high prices as a result of the price-fixing and unfair competition conspiracy...." (C. 192.) (Emphasis added.)
These pleadings expressly allege "monopolistic activities that [have] occur[red] `within this state'" (the language of the majority holding, 746 So.2d at 339) and thus which are, according to the express majority holding, regulated by § 6-5-60. Therefore, the pleadings, even as judged by the express language of the majority holding, state a claim upon which relief can be granted; and this Court should not reverse the trial judge's recognition of this claim in his denial of the defendants' motions.
To the extent that the majority deems its holding to mean that § 6-5-60 does not regulate the conduct alleged by the plaintiffs, the majority proceeds from the mistaken premise that, in 1907, when § 6-5-60 originated, federal constitutional law prohibited states from regulating combinations in restraint of trade in interstate commerce. From this mistaken premise, the majority concludes that the Alabama legislature, in adopting its statute, must not have intended to regulate such conduct, but must have intended to exempt it, notwithstanding the utter absence of any language excluding the conduct and notwithstanding the all-encompassing language of the statute.
*348 The United States Supreme Court case of Standard Oil of Kentucky v. Tennessee, 217 U.S. 413, 30 S.Ct. 543, 54 L.Ed. 817 (1910), however, declares the pertinent federal constitutional jurisprudence as it existed in 1907. There, Justice Holmes himself writes, "certainly there is nothing in the present state of the law, at least, that excludes the states from a familiar exercise of their power." 217 U.S. at 422, 30 S.Ct. 543 (emphasis added).
Standard Oil of Kentucky is controlling precedent for the case at issue on the power of states to regulate combinations in restraint of trade in interstate commerce notwithstanding the Commerce Clause of the United States Constitution. Tennessee adopted its statute in 1903, four years before Alabama adopted its, and well after Congress adopted the Sherman Antitrust Act. The State of Tennessee sued to disenfranchise Standard Oil of Kentucky for entering "into an arrangement for the purpose and with the effect of lessening competition in the sale of oil at Gallatin, Tennessee, and with the further result of advancing the price of oil there." 217 U.S. at 419, 30 S.Ct. 543. The operative facts are that Standard Oil of Kentucky had induced "merchants in Gallatin to revoke orders on a rival company for oil to be shipped from Pennsylvania, by an agreement to give them 300 gallons of oil." 217 U.S. at 421, 30 S.Ct. 543. The pertinent defense advanced by Standard Oil of Kentucky was "that, although construed by the [trial] court to apply to domestic business only, nevertheless [the statute] is held to warrant turning the defendant out of the State for an interference with interstate trade," 217 U.S. at 421, 30 S.Ct. 543 (emphasis added), and that the statute is, therefore, "an unconstitutional interference with commerce among the States," 217 U.S. at 419, 30 S.Ct. 543. The trial court, affirmed by the Supreme Court of Tennessee, rejected this defense and forbade Standard Oil of Kentucky to do business "other than interstate commerce" in Tennessee. Standard Oil of Kentucky appealed to the United States Supreme Court, which affirmed. Justice Holmes reasons:
"The mere fact that it may happen to remove an interference with commerce among the States as well with the rest does not invalidate it. It hardly would be an answer to an indictment for forgery that the instrument forged was a foreign bill of lading, or for assault and battery that the person assaulted was engaged in peddling goods from another State. How far Congress could deal with such cases we need not consider, but certainly there is nothing in the present state of the law at least that excludes the States from a familiar exercise of their power." 217 U.S. at 422, 30 S.Ct. 543.
This case, Standard Oil of Kentucky, is controlling because the interstate features of the commerce are as strong as, and the intrastate features are no stronger than, those respective categories of features in the case at issue. Standard Oil of Kentucky distinguishes the intrastate aspects of interstate commerce and allows the states to regulate those intrastate aspects. Importantly, one of the intrastate aspects the Supreme Court allows Tennessee to regulate is the "domestic business," the sales within Tennessee, by the oil company, even though most or all of the oil to be sold (or not sold) would necessarily have travelled in interstate commerce into Tennessee.
On the one hand, some treatises and some passages in some cases say or imply that the regulatory authority of the states over combinations in restraint of trade is confined to intrastate commerce. On the other hand, the actual rulings applicable to the parties in the cases decided by the Alabama state appellate courts, the United States Supreme Court, and the United States Circuit Courts of Appeals with jurisdiction over Alabama cases have always allowed the states to regulate the intra state aspects of combinations in restraint of trade in interstate commerce as "interstate *349 commerce" is now defined. See, e.g., Georgia Fruit Exchange v. Turnipseed, 9 Ala.App. 123, 62 So. 542 (1913); Dothan Oil Mill v. Espy, 220 Ala. 605, 127 So. 178 (1930); Standard Oil of Kentucky, supra; California v. ARC America Corp., 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989); In re Brand Name Prescription Drugs Antitrust Litigation, 123 F.3d 599 (7th Cir.1997) (reversing a United States District Court decision from Alabama, consolidated with a similar case in the Northern District of Illinois under the federal multi-district litigation rules).
The majority does not cite a single Alabama state appellate court decision, United States Supreme Court decision, or United States Circuit Court of Appeals decision which invalidates a complaint, claim, or defense of a party to the case grounded on a state law regulating combinations in restraint of trade. None of these courts has invoked the Commerce Clause to invalidate such a complaint, claim, or defense by a party before the court.
The expansion of the inclusiveness of the term interstate commerce over the decades has in no way diminished the power of the states to regulate combinations in restraint of trade. The states can regulate such conduct as that alleged by the plaintiffs in the case at issue now just as the states could in 1907, when § 6-5-60 originated. In re Brand Name Prescription Drugs and California v. ARC, supra.
An analysis of the Alabama state appellate court decisions cited by the defendants and the majority is instructive as much for what the decisions do not hold as for what they do hold. They will be discussed in chronological order.
Georgia Fruit Exchange v. Turnipseed, 9 Ala.App. 123, 62 So. 542 (1913), decided six years after the origination of § 6-5-60, held that Alabama courts would condemn a contract effectuating a combination in restraint of trade regardless of whether the trade be intrastate or interstate.
"It is not necessary to the invalidity of the contract here and to the disposition of the present case to decide whether the contract is in violation of the state statute or of the federal statute, or any statute at all. We are not dealing with a criminal prosecution, and need not therefore concern ourselves with the question as to whether the commerce involved in the contract is inter or intra state, or both, or whether the terms of either statute have been violated. It is sufficient, as before seen, to destroy it and all obligations created by it, if it violates the public policy of the state or nation, as declared in judicial decisions predicated upon the principles of the common law obtaining here. It does contravene such public policy if it unreasonably restrains trade, because in such event it tends to create a monopoly, which is odious to our law and detrimental to public good, which requires freedom of trade and competition`the life of a people's prosperity.'Bir. & Pratt [Mines St.] Ry. Co. v. Bir. St. Ry. Co., 79 Ala. [465, 475 (1885)]." 9 Ala.App. at 142, 62 So. at 549.
This decision is significant for several reasons. First, the trade under scrutiny certainly would be called "interstate" commerce these days. The contract on which the plaintiff sued, and to which the defendant successfully objected, was part of a combination which gave the plaintiff brokerage control over at least 60 percent of the peach crop in the southeast. Second, Georgia Fruit Exchange opines that not only federal and state statutory law but also common law existing contemporaneously with the origination of § 6-5-60 (which the opinion does not address specifically) all forbade combinations in restraint of trade. And, third, the opinion states that the statutory law both federal and state could apply to this multi-state combination. 9 Ala.App. at 130-33, 62 So. at 545-46.
The chief holding of Dothan Oil Mill Co. v. Espy, 220 Ala. 605, 127 So. 178 (1930), is *350 that Alabama residents may sue other Alabama residents for combining in restraint of trade in cotton seed even though the products to be manufactured by one or more parties to the trade "may eventually find their way into and become commodities of interstate commerce." 220 Ala. at 610, 127 So. at 182.
"Taking as true the averments of the bill, as must be done on demurrer, and interpreting the alleged resolutions made Exhibit A to the bill in the light of the facts averred, however inoffensive they may appear on their face, we have no difficulty in reaching the conclusion that the defendants have entered into a combine, pool trust, or confederation, to regulate or fix the price of cotton seed in this state, and are attempting to destroy competition in the sale thereof in violation of the state anti-trust laws. Code 1923, §§ 5212-5214; Southern Cotton Oil Co. v. Knox et als., 202 Ala. 694, 81 So. 656; Arnold v. Jones'[Jones] Cotton Co., 152 Ala. 501, 44 So. 662, 12 L.R.A. (N.S.) 150; Georgia Fruit Exchange v. Turnipseed, 9 Ala.App. 123, 62 So. 542." 220 Ala. at 610, 127 So. at 183.
The secondary holding of Dothan Oil Mill is that the complainants were not suing under the "Sherman and Clayton Acts (15 USCA § § 1-7, 15, and sections 12-27, 44) which confer on the federal courts exclusive jurisdiction to enforce said acts." 220 Ala. at 610, 127 So. at 182.
Dothan Oil Mill also exemplifies the limited scope of the term interstate commerce in the older cases as follows:
"The fact, of itself, that an article when in the process of manufacture is intended for export to another state does not render it an article of interstate commerce." 220 Ala. at 610, 127 So. at 182.
Of course, all commerce that was not "interstate" (or international) would necessarily have been "intrastate." Thus, to the extent that the definition of "interstate commerce" was narrow, the definition of "intrastate commerce" was concomitantly broad. Therefore, language in the older cases confining state regulatory power over combinations in restraint of trade to "intrastate commerce" does not confine that power to the limited sphere of trade that would fit inside today's extremely restricted definition of "intrastate commerce" and does not prohibit the states from regulating the intrastate aspects of combinations in restraint of trade in what is "interstate commerce" by today's more inclusive definition. Indeed, as revealed, Dothan Oil Mill allows the suit for violations of Alabama antitrust statutes committed in the Alabama-based aspects of what would now be regarded as inter state commerce.
Ex parte Rice, 259 Ala. 570, 67 So.2d 825 (1953), holds that, for a pleading to invoke the Sherman and Clayton acts in the Alabama state courts, the pleading must allege that the matter in controversy (a filling station in this case) is directly (and not merely incidentally) influential in effecting a monopoly, 259 Ala. at 573, 67 So.2d at 828, and must allege that the lessening of competition is substantial, 259 Ala. at 574, 67 So.2d at 828. The Rice court concluded on this topic only that the allegations of the particular pleading there at issue (an answer) did not meet those requirements of the Sherman and Clayton Acts and therefore did not effectively invoke those Acts. 259 Ala. at 575, 67 So.2d at 829. The chief holding of Rice follows that, because the pleadings invoked only Alabama state law, Alabama discovery privileges applied so as to defeat the discovery sought by the petitioner. 259 Ala. at 575-76, 67 So.2d at 829.
Rice does not in any way whatsoever hold that Alabama state law cannot prohibit and redress combinations in restraint of trade in interstate commerce. On the contrary, notwithstanding the interstate nature of the commerce in the case, Rice specifically holds that state law controlled. 259 Ala. at 575, 67 So.2d at 829.
San Ann Tobacco Co. v. Hamm, 283 Ala. 397, 217 So.2d 803 (1968), does not *351 address, tangentially or otherwise, § 6-5-60 or any dispute about the Commerce Clause. While the Court referred to the Alabama Unfair Cigarette Sales Act, Tit. 57, § 83(3), Ala.Code 1940, as "an exercise of the police power of the state over intrastate commerce," 283 Ala. at 400, 217 So.2d at 805 (emphasis added), the commerce at issue was the sale of nationally manufactured and distributed cigarettes in Jefferson County, which would be called "interstate commerce" by today's definition. San Ann held only that the act could not be amended to forbid price cutting absent intent to "destroy or substantially lessen competition." 283 Ala. at 401, 217 So.2d at 805. The San Ann court left intact the original act, which forbade price cutting with the intent to destroy or substantially to lessen competition, notwithstanding the national character of the source of the cigarettes.
The case which epitomizes the extremely narrow scope of the old-timey definition of "interstate commerce" and the concomitantly broad scope of the old-timey definition of intrastate commerce, and which virtually eliminates any likelihood that Alabama legislators would have thought the Sherman Act preempted the power of the states to regulate combinations in restraint of trade in 1907, is United States v. E.C. Knight Co., 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325 (1895). There the United States Supreme Court held that a monopoly over 98% of the manufacture of sugar in the United States "bore no direct relation to commerce between the States or with foreign nations," 156 U.S. at 17, 15 S.Ct. 249, and thus did not warrant a suit under the Sherman Act.
The Sherman Act was essentially the same in 1907, when § 6-5-60 originated, as it is now. The Commerce Clause and the Supremacy Clause of the United States Constitution were exactly the same then as now. Barring some judicial philosophy that the courts have the power to change the constitution, a philosophy which I reject, the Commerce Clause no more restricted the power of the states to regulate combinations in restraint of trade then than it does now. In 1907 the Alabama legislators' oath of office obliged them to support and to defend the same Commerce Clause and Supremacy Clause, not to support and to defend misleading or mistaken language, or passages in distinguishable contexts, in judicial decisions.
In 1907 combinations in restraint of trade were as odious as trafficking in cocaine is now. Virtually all cocaine trade is interstate and international, well within the ambit of the Commerce Clause. The mood and law in 1907 no more limited Alabama legislators' intent to regulate all combinations in restraint of trade affecting Alabamians than the mood and law of the present limit the current intent of Alabama legislators to eliminate cocaine traffic, intrastate, interstate, or international.
The plain and unambiguous language of § 6-5-60 reaches the Alabama aspects of combinations in restraint of trade in interstate commerce. This Court has no valid ground to question the intent or to engraft an exception.
Thus, the majority opinion reversing the trial court should be withdrawn, and the trial court should be affirmed, first because the plaintiffs' complaint states a claim upon which relief can be granted even under the holding written by the majority and, second, because in 1907 Alabama could, and the plain and unambiguous language of § 6-5-60 does, regulate combinations in restraint of trade in interstate commerce resulting in damage from sales and purchases in Alabama.
SEE, Justice (statement of nonrecusal).
For the reasons given in my statement of nonrecusal in Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper, Inc., 746 So.2d 966, 990 (Ala.1999) (See, J., statement of nonrecusal), I decline to recuse.
*352 HOOPER, C.J., and MADDOX, KENNEDY,[15] COOK, BROWN, and JOHNSTONE, JJ., concur.
NOTES
[1] We note that in 54A Am.Jur.2d Monopolies, Restraints of Trade, and Unfair Trade Practices § 798 (1996), the following statement appears:

"A state antitrust act can have no extra-territorial operation; consequently, the courts in construing a state antitrust statute will generally apply it to trusts and combinations formed or operated within the state, even though its terms are broad enough to include combinations formed with parties residing outside the state."
But see the recent decision of the United States Court of Appeals for the Seventh Circuit in In re: Brand Name Prescription Drugs Antitrust Litigation, 123 F.3d 599 (7th Cir. 1997), citing R.E. Spriggs Co. v. Adolph Coors Co., 37 Cal.App.3d 653, 112 Cal.Rptr. 585 (Dist.Ct.App.1974), and Heath Consultants, Inc. v. Precision Instruments, Inc., 247 Neb. 267, 527 N.W.2d 596 (1995).
[2] The Legislature had enacted a law, approved on February 23, 1883, regulating the "pooling of freights":

"Section 1. Be it enacted by the General Assembly of Alabama, That it shall be unlawful for two or more railroad companies or persons operating railroads in this State to enter into any agreement among themselves, directly or indirectly, for the division among themselves of the freight carrying business at any station, town or city in this State, or into any pool arrangement among themselves of the nature and character aforesaid, the object, purpose and effect of which in either event shall be to prevent free and fair competition among said railroad companies or persons operating said railroads, for said freight carrying business, and to establish extortionate rates in favor of said companies or persons in doing said business, and which shall have the effect of being in undue restraint of the trade and business at any such station, town or city of this State.
"Sec. 2. Be it further enacted, That any officer, agent or servant of any such company, or person operating any railroad in this State who shall violate any of the provisions of this act, or who shall aid or assist in making or carrying out or performing any such agreement or pool arrangement shall be guilty of a misdemeanor and on conviction for every such offense shall be fined not less than fifty dollars, nor more than two hundred dollars, at the discretion of the court trying the same.
"Sec. 3. Be it further enacted, That it is the true intent and meaning of this act, that any such agreement, rates or pool agreement made by any convention or association of freight agents, or commissioner of freight rates or rate making committee outside of this State, but to be performed in whole or in part in this State, shall as to such part of the same, as is to be performed within this State, come within the provisions of this act.
"Sec. 4. Be it further enacted, That any agreement, rates, or pool arrangements made by two or more railroad companies, or persons operating railroads in this State, or by any convention, or by any association of freight agents or commissioner of freight rates, or rate making committee outside of this State, but to be performed in whole or in part within this State for the purpose of cheapening freight rates or of extending additional facilities to the public generally, or to any town, city or station in this State and which are not extortionate and in undue restraint of trade at any town, city, or station in this State, shall not be construed as coming within this act.
"Sec. 5. Be it further enacted, That if any such agreement, rate, or pool arrangement as is mentioned in the fourth section of this act shall have the certified approval of the railroad commission of Alabama, it shall be deemed as prima facie lawful and just in any proceeding before any court or officer of this State, and no officer, agent or servant of any railroad company, or person shall be liable to prosecution, for aiding or assisting in carrying out, or performing any such agreement or pool arrangement, so approved by any railroad commission of Alabama."
(Emphasis added.) Ala. Acts 1882-83, Act No. 79, p. 152-53. Section 2 of Act No. 79 was codified in the Alabama Code of 1886 as Article IV, § 4145.
[3] United States v. E.C. Knight Co. was the Supreme Court's first decision construing the Sherman Antitrust Act. The full text in which this quotation appears is as follows:

"It cannot be denied that the power of a State to protect the lives, health, and property of its citizens, and to preserve good order and the public morals, `the power to govern men and things within the limits of its dominion,' is a power originally and always belonging to the States, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States, and essentially exclusive. The relief of the citizens of each State from the burden of monopoly and the evils resulting from the restraint of trade among such citizens was left with the States to deal with, and this court has recognized their possession of that power even to the extent of holding that an employment or business carried on by private individuals, when it becomes a matter of such public interest and importance as to create a common charge or burden upon the citizen; in other words, when it becomes a practical monopoly, to which the citizen is compelled to resort and by means of which a tribute can be exacted from the community, is subject to regulation by state legislative power. On the other hand, the power of Congress to regulate commerce among the several States is also exclusive. The Constitution does not provide that interstate commerce shall be free, but, by the grant of this exclusive power to regulate it, it was left free except as Congress might impose restraints. Therefore it has been determined that the failure of Congress to exercise this exclusive power in any case is an expression of its will that the subject shall be free from restrictions or impositions upon it by the several States, and if a law passed by a State in the exercise of its acknowledged powers comes into conflict with that will, the Congress and the State cannot occupy the position of equal opposing sovereignties, because the Constitution declares its supremacy and that of the laws passed in pursuance thereof; and that which is not supreme must yield to that which is supreme. `Commerce, undoubtedly, is traffic,' said Chief Justice Marshall, `but it is something more; it is intercourse. It describes the commercial intercourse between nations and parts of nations in all its branches, and is regulated by prescribing rules for carrying on that intercourse.' That which belongs to commerce is within the jurisdiction of the United States, but that which does not belong to commerce is within the jurisdiction of the police power of the State. Gibbons v. Ogden, 9 Wheat. 1, 189, 210, 6 L.Ed. 23; Brown v. Maryland, 12 Wheat. 419, 448, 6 L.Ed. 678; The License Cases, 5 How. 504, 599, 12 L.Ed. 256; [County of] Mobile v. Kimball, 102 U.S. 691, 26 L.Ed. 238; Bowman v. Chicago & N.W. Railway, 125 U.S. 465, 8 S.Ct. 689; Leisy v. Hardin, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128; In re Rahrer, 140 U.S. 545, 555, 11 S.Ct. 865, 35 L.Ed. 572."
156 U.S. at 11-12, 15 S.Ct. 249.
In P. Areeda & D. Turner, 1 Antitrust Law, An Analysis of Antitrust Principles and their Application, § 232c (1978), we find the following discussion of Knight:
"The 1895 Knight case, the Supreme Court's first Sherman Act decision, held a national monopoly of sugar manufacturing beyond the constitutional reach of the act because mere manufacturing was not `commerce.' At that time, the Commerce Clause embraced only the actual and `direct' purchase, sale, or transportation of goods across state lines. The Court acknowledged that such commerce was affected by the sugar monopoly, but only `indirectly.'
"Two characteristics of the Knight decision remain important today. First, the Court never reached the merits of the government's case because the constitutional determination was made first, and the courts still treat the commerce question as a preliminary jurisdictional hurdle in antitrust litigation. Second, the jurisdictional inquiry was entirely independent of the Sherman Act's purposes. That separation seemed feasible in 1895 when `interstate commerce' was wholly dependent upon the location of the defendant's conduct, and without regard to its impact on the interests protected by the Sherman Act. This neat separation of jurisdictional and substantive inquiries caused difficulties with later and more expansive definitions of interstate commerce."
[4] We note that the Supreme Court had held at the time Alabama first enacted its antitrust statutes that the Commerce Clause, in conferring on Congress the power to regulate commerce, did not wholly withdraw from the states the power to regulate matters of local concern with respect to which Congress had not exercised its power, even though the regulation in some way affected interstate commerce. See, e.g., California v. Thompson, 313 U.S. 109, 113, 61 S.Ct. 930, 85 L.Ed. 1219 (1941), in which the Court noted:

"Ever since Willson v. Black Bird Creek Marsh Co., 2 Pet. 245, 7 L.Ed. 412 [(1829)], and Cooley v. [Board of Wardens of the Port of Philadelphia], 12 How. 299, 13 L.Ed. 996 [(1851)], it has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce, but which because of their local character and their number and diversity may never be adequately dealt with by Congress. Because of their local character, also, there is wide scope for local regulation without impairing the uniformity of control of the national commerce in matters of national concern and without materially obstructing the free flow of commerce which were the principal objects sought to be secured by the Commerce Clause. Notwithstanding the Commerce Clause, such regulation in the absence of Congressional action has, for the most part, been left to the states by the decisions of this Court, subject only to other applicable constitutional restraints."
See, also, South Carolina State Highway Department v. Barnwell Brothers, Inc., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938); Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480 (1917); Bowman v. Chicago & N.W. Ry., supra, and the cases cited therein. There is nothing, however, in the Supreme Court's decisions in United States v. E.C. Knight Co., supra, and Addyston Pipe & Steel Co. v. United States, supra, that indicates that the Court would have viewed extraterritorial state antitrust provisions as falling within that constitutionally permissible category of local regulation having only an indirect or incidental effect on interstate commerce.
[5] The Court of Appeals for the Seventh Circuit reversed the district court's order denying the motion to remand. In doing so, the court recognized that at the turn of the century the Alabama Legislature lacked the constitutional authority to regulate interstate commerce through the use of antitrust provisions:

"The cases on which the defendants rely, for example, Georgia Fruit Exchange v. Turnipseed, 9 Ala.App. 123, 62 So. 542, 546 (1913), date from a period in which, interstate commerce being narrowly defined, see, e.g., Hadley Dean Plate Glass Co. v. Highland Glass Co., 143 Fed. 242, 244 (8th Cir.1906), and federal power to regulate such commerce being deemed exclusive, id.; United States v. E.C. Knight Co., 156 U.S. 1, 11, 15 S.Ct. 249, 253, 39 L.Ed. 325 (1895), a state statute limited to intrastate commerce would have some, albeit a strictly limited, scope and could not have a greater scope no matter how much the state wanted it to."
123 F.3d at 612-13. The court then went on to reason that "[t]he cases thus were not interpreting the statute; they were interpreting the Constitution as placing upper and lower bounds on the reach of the statute." 123 F.3d at 613. Stating that the United States Constitution "has since been reinterpreted," the court noted that "[o]ther states [have] read their antitrust statutes to reach what is now understood to be interstate commerce," and that "we are given no reason to suppose that Alabama would buck this trend." Id. This Court's decisions in Siegelman v. Chase Manhattan Bank, supra; Ex parte Dixie Tool & Die Co., supra; and Ex parte Louisville & N.R.R., supra, which created a presumption that the Legislature did not intend to exceed its constitutional authority in enacting this state's antitrust provisions, preclude the kind of statutory construction that the Seventh Circuit Court of Appeals thought we might engage in. As we have explained, this presumption was strengthened by, among other things, the extensive legislative history of the Alabama statutes that we have set out, including the critical limiting words contained in Act No. 202"within this state." The Seventh Circuit apparently ruled without the benefit of this legislative history or this Court's decisions referenced above. We also note that the Seventh Circuit expressed concern that "[i]f the statute is limited today as it once was to commerce that is not within the regulatory power of Congress under the commerce clause, it is a dead letter because there are virtually no sales, in Alabama or anywhere else in the United States, that are intrastate in that sense." 123 F.3d at 613. However, the statutes, as we interpret them, may yet have a field of operation because they continue to reach transactions within this state, in the geographic sense, even though such transactions may affect interstate commerce as currently defined by federal law. See Cantor v. Detroit Edison Co., 428 U.S. 579, 633, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (Stewart, J., dissenting) (recognizing that when Congress passed the Sherman Antitrust Act, state efforts to restrain monopolies were "restricted to the geographic boundaries of the several states").
[6] Of course, Alabama's antitrust statutes may not be applied in a manner that discriminates against or unduly burdens interstate commerce. See Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
[7] In Perez v. United States, 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), the United States Supreme Court explained:

"The Commerce Clause reaches, in the main, three categories of problems. First, the use of channels of interstate or foreign commerce which Congress deems are being misused.... Second, protection of the instrumentalities of interstate commerce.... Third, those activities affecting commerce."
We are concerned with the third element of interstate-commerce jurisdiction stated in Perez.
[8] A. Marshall, Principles of Economics, 493-94, 820 (8th ed.1938).
[9] Lande, Wealth Transfers as the Original and Primary Concern of Antitrust: The Efficiency Interpretation Challenged, 34 Hastings L.J. 67, 150 (1982).
[10] 21 Cong. Rec. 1768, 2609-10 (1890).
[11] Sections 5557, 5558, and 5559 of the 1896 Code were adopted in primarily the same form in the 1907 Code, Chapter 273, as § 7579, § 7580, and § 7582. The legislature added § 7581 of the 1907 Code entitled "Monopolies, penalty for." Sections 7579, 7580, 7581, and 7582 were readopted in the 1923 Code as § 5212, § 5213, § 5214, and § 5215. Sections 5212, 5213, and 5214 were readopted in the 1940 Code as Title 57, § 106, § 107, and § 108. Sections 106, 107, and 108 were readopted in the 1975 Code as § 8-10-1, § 8-10-2, and § 8-10-3.
[12] Sections 2487 and 2488 were adopted in primarily the same form in the 1923 Code, as § 5697 and § 5698. Sections 5697 and 5698 were readopted in the 1940 Code as Title 7, § 124 and § 125. Sections 124 and 125 were readopted in the 1975 Code as § 6-5-60(a) and (b) respectively.
[13] "The Congress shall have Power ... to regulate Commerce ... among the several states...." U.S. Const. Art. I, § 8, cl. 3.
[14] The court did not address the issue whether state or federal antitrust laws were applicable in that case, because the contract was held to be void.
[15] Justice Kennedy's vote regarding the motion to recuse was made prior to his resignation on June 11, 1999.